**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| | |
|---|---|
| RUSSIAN RESEARCH CENTER <br> THE KURCHATOV INSTITUTE, <br><br>             **Plaintiff,** <br><br>    **v.** <br><br> WESTERN SERVICES CORP., et al., <br><br>             **Defendants and** <br>             **Third-Party Plaintiff,** <br>    **v.** <br><br> GSE SYSTEMS, INC. <br><br>             **Third-Party** <br>             **Defendants.** | **Case No.: AMD 02-3878** |

**MEMORANDUM OF LAW IN SUPPORT OF WESTERN
SERVICES CORP.'S MOTION FOR A
PROTECTIVE ORDER AGAINST ABUSIVE THIRD PARTY DISCOVERY**

Plaintiff Russian Research Center, The Kurchatov Institute ("Kurchatov") is aggressively and wrongfully using third party subpoenas as a competitive weapon to harm defendant Western Services Corporation's ("Western") relations with current and potential customers – *including customers currently considering whether to award multimillion dollar contracts to Western's prime contractor, Data Systems & Solutions ("DS&S").* Kurchatov has served document subpoenas on more than a dozen of Western's actual and potential customers, despite the fact Kurchatov already requested the majority of these

documents from Western directly, and despite the fact Kurchatov made no effort to inquire whether the documents could be obtained from Western's prime contractor, DS&S. As shown below, there is every reason to believe that either Western or DS&S have copies of all properly producible documents, and both Western and DS&S stand ready to produce those that are within the scope of Rule 26.

As in <u>Joy Technologies, Inc. v. Flakt, Inc.</u>, 772 F. Supp. 842 (D. Del. 1991), Kurchatov's "attempted discovery from [the defendant's] customers is a form of harassment which could jeopardize [defendant's] business relationship with its customers." The Court should promptly issue the same type of relief granted by the <u>Joy Technologies</u> court: a protective order prohibiting Kurchatov from seeking discovery from Western's customers without first "demonstrat[ing] that it has a specific need for evidence available only from third party customers" of the defendant. <u>Id</u>. at 849.

## FACTUAL AND PROCEDURAL BACKGROUND

### Nature of the Claims

This lawsuit concerns competing intellectual property claims relating to power plant simulation software called "SimPort."[1]  Western is a subcontractor that has worked since 1997 in developing and marketing SimPort, first with Science Applications International Corporation ("SAIC"), and later with DS&S (a joint venture between SAIC and Rolls Royce).   Jenkins Decl. ¶ 6.  Kurchatov also claims that Western has no right to use the name "SimPort," even though Western and DS&S have used that mark continuously since at least 1997 and even though Kurchatov made no use of it (except in reference to projects completed by Western and SAIC/DS&S) until at least 2002.

The key questions presented by Kurchatov's claims against Western are (i) whether Kurchatov has any rights with respect to the 1997 version of SimPort, and if so, whether Western has infringed those rights, (ii) whether the subsequent version of SimPort developed by Western (SimPort 2000) infringes any rights of Kurchatov, and (iii) whether

---

[1] Simulation software is used to build simulation models that replicate the power plant's equipment and operations.  Nuclear and traditional fossil-fuel power plants train their operators with these simulators as a means of both optimizing plant efficiency and preparing for emergencies.

Western is permitted to continue using the name SimPort, which it has used (along with SAIC and DS&S) since 1997 to identify its power plant simulation programs.[2]

Western has filed counterclaims against Kurchatov for trademark infringement, unfair competition, and tortious interference. As set forth in Western's counterclaims, Kurchatov and one of Western's and DS&S's chief competitors, GSE Systems, Inc. ("GSE"), have used the artifice of this lawsuit and other anticompetitive means for one purpose only: to drive customers away from Western and DS&S. The subpoena campaign at issue here is simply another improper and abusive tactic that GSE and Kurchatov have deployed.[3]

## The Market for Power Plant Simulation Software

In the U.S. market for power plant simulation software, three principal firms (or combinations of firms) compete with one another: (1) GSE, an American firm with which Kurchatov allied itself (and to which it purported to give an "exclusive license" to SimPort) shortly before bringing this lawsuit; (2) DS&S, which, with Western, offers SimPort; and

---

[2] Western and DS&S do not provide their customers SimPort in its raw form. Instead, each customer receives a highly customized version of SimPort, built to each customer's specification and reflecting (and including) a vast array of proprietary data about each customer's power plant. Jenkins Decl. ¶ 8. The customized version of SimPort is called a "data load." Id.

[3] As an illustration of Kurchatov's abuse of the discovery process, it deployed process servers on Western's employees to serve deposition subpoenas after the undersigned informed Kurchatov's counsel that formal service of subpoenas was not necessary.

(3) a simulation company called CAE.  Jenkins Decl. ¶ 11.  Kurchatov has never sold

simulation software in the United States.  Id.  DS&S/Western, CAE, and GSE regularly

compete for the same power plant contracts, each worth hundreds of thousands (and

sometimes millions) of dollars.  Id. ¶ 12.

In this competitive context, Kurchatov's business partner, GSE, has a strong

incentive to try to damage DS&S/Western, one of its two principal competitors.  And it has

aggressively used this lawsuit to achieve that improper goal.  GSE's tactics are well

illustrated by a self-serving e-mail sent to many DS&S/Western customers by Jody Ryan,

a GSE executive and the creator of competing power plant simulation software.  Mr.

Ryan's e-mail, sent late in 2002, was clearly designed to convey the (utterly false)

impression — which Ryan characterized as "bad news" — that the customers needed

immediately to *stop using* the SimPort software they had acquired from DS&S/Western:

> Hi Guys,
>
> In late November Kurchatov Institute filed a lawsuit in the
> Federal Circuit Court in Baltimore. They are suing Western
> Services Corporation and others over SimPort.  *They are asking
> that anyone who has received SimPort from Western Services or
> received it from anyone associated with Western Services stop
> using SimPort and destroy all copies.*  I do not know any more
> than this, and I am not a legal expert, so I have no advice or
> opinions to offer.  I am sure that there is a way to get a copy of
> the filing, since it is public, but I am not sure how to do it.  *Sorry
> to bring bad news during the holiday season.*  Hope all of you
> had a great Thanksgiving, and hope you and your families have
> a wonderful Christmas.

Ex. 2 (Jody Ryan e-mail) (emphasis added).

As discussed below, Kurchatov's current pursuit of completely unnecessary discovery from DS&S/Western's customers is simply the newest phase in the GSE/Kurchatov effort to use this litigation to drive business away from DS&S/Western and to GSE.

### The Subpoenas to DS&S Customers

Strikingly, although Kurchatov apparently believes that DS&S and SAIC had a central role in the development and marketing of SimPort (as reflected by Kurchatov's failed effort to add DS&S and SAIC as defendants), Kurchatov made no effort to seek discovery from DS&S or SAIC prior to subpoenaing power plant customers.  Instead, beginning in the middle of May 2003, Kurchatov began serving subpoenas on DS&S *customers* (including customers who originally contracted with SAIC, before the formation of DS&S), making no effort whatsoever to determine whether the requested documents could be obtained more conveniently (and without doing competitive harm) from DS&S. The subpoenas, which may be found at Ex. 3 are grossly overbroad on their face, seek documents already requested from Western, and seek the same categories of documents from each of the subpoena targets.[4]  For example, the subpoenas seek *all* documents

---

[4] The subpoenas were served on more than a dozen different power plants.  (Western learned of many of the subpoenas only after Kurchatov filed the pertinent affidavit of service, and received copies of the subpoenas served on Newport News Shipbuilding and Entergy Nuclear Operations Inc. on the date of this filing, only after Western's counsel brought the issue of missing subpoenas to the attention of Kurchatov's counsel.)

supporting any "joint funding activity" in which SimPort was provided, and *all* "memos, email, correspondence, notes and other documents referring to, relating to or reflecting the simulation software known as AIS '95 or SIMPORT." Id.

The Kurchatov customer subpoenas have generated tremendous concern and confusion among the customers that have received them. Jenkins Decl. ¶¶ 10, 14-18. In addition to creating anxiety as to how to respond, the subpoenas also created substantial confusion about their legal significance. The experience with different customers illustrates the types of harm to Western (and its prime contractor, DS&S) that the Kurchatov subpoenas have caused:

- TXU Electric was one of the companies that received Jody Ryan's self-serving e-mail suggesting that TXU, along with other SimPort customers, would soon be required to uninstall SimPort. Jenkins Decl. ¶ 15. After receiving Kurchatov's subpoena this Spring, a TXU representative — the same person who received the Ryan e-mail — contacted DS&S in a panic, worried that the subpoena required TXU to uninstall SimPort. Id.

- Vermont Yankee Nuclear Power Corporation ("Vermont Yankee") determined, based on receipt of the subpoena, that DS&S's right to sell a completely unrelated program — called RELAP — was somehow in jeopardy. Jenkins Decl. ¶ 16. In fact, RELAP is a wholly distinct software package distributed by DS&S under license from an unrelated third party; rights to RELAP are in no respect at issue in this lawsuit.

- Two of DS&S's current customers are in the final phase of selecting between competing bids from DS&S and from GSE. Kurchatov has served its overbroad subpoenas on both of these DS&S customers. It is believed service of these subpoenas was strategically timed so as to occur after DS&S's submission of its final bids to both customers. Jenkins Decl. ¶ 18.

These specific examples are merely illustrative; the full scope of the subpoena

campaign's harmful effects are no doubt much broader than those illustrated here, since

customers are under no obligation to report their adverse reactions to Western or DS&S.

### Western's and DS&S's Efforts to Minimize the Burden on Their Customers While Providing Kurchatov With Any Documents That Might Potentially Be Relevant

Western and DS&S are acutely aware of the damage to their business that this

lawsuit may cause while it is pending, even though Western is confident that it will

prevail on the merits.   As a result, DS&S and SAIC have volunteered to produce

documents in their possession that are responsive to the subpoenas and within the scope

of discovery permitted by Fed. R. Civ. P. 26.  Ex. 4.[5]  Moreover, although Western and

DS&S believe that the power plant simulators themselves are not subject to production

under Fed. R. Civ. P. 26, each has offered to produce the simulators if Kurchatov would

withdraw the customer subpoenas.  Exs. 4 & 5.

On first learning of DS&S's offer, Kurchatov's outside counsel indicated that if

DS&S and SAIC produced responsive documents, Kurchatov would withdraw the

subpoenas.  But after an initial phone call and a letter from DS&S's counsel  formally

extending the offer and inviting Kurchatov to negotiate the scope of any agreed

production, Kurchatov's outside counsel flatly rejected even the *idea* of negotiating about

---

[5] Western has agreed to produce the relevant documents in response to Kurchatov's discovery requests, which are duplicative of the requests issued to the customers.

reducing the burdens on customers in exchange for a voluntary production by DS&S or SAIC.  See Ex. 6 (June 23, 2003 letter from Kurchatov's counsel).  Kurchatov's lawyers rejected the exact same overture from Western.  Ex. 7.[6]

## The Relief That Western Seeks

Western seeks a protective order requiring Kurchatov to withdraw any pending subpoenas to customers, prohibiting Kurchatov and GSE from serving discovery requests on non-party customers or potential customers of Western or DS&S without first seeking the consent of Western and, if no agreement is possible, then demonstrating to the Court that the proposed discovery is relevant and necessary and could not be produced by Western, DS&S, or SAIC.   This limited relief will help ensure that Kurchatov and GSE do not cause unfair — and entirely unnecessary — competitive harm to Western and DS&S while this case is pending.

---

[6] When counsel conferred this week in an attempt to resolve this issue, counsel for Kurchatov agreed to *consider* holding a few subpoenas in abeyance, and then reconsider the breadth of those subpoenas after it reviewed documents produced by Western and DS&S.  This proposal fell far short of resolving the dispute, however, because it did not address the burden placed on *all* of the subpoenaed customers due to the subpoenas' overbreadth.

## ARGUMENT

**I.    RULE 26(c) AUTHORIZES DISTRICT COURTS TO ENTER ORDERS PREVENTING LITIGANTS FROM HARASSING THEIR ADVERSARIES' CUSTOMERS**

Under Fed. R. Civ. P. 26(c), the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Rule 26(c) specifically provides that the Court may order, among other things, "that the disclosure or discovery not be had," "that the disclosure or discovery may be had only on specified terms and conditions," or "that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery."  Fed. R. Civ. P. 26(c)(1)-(3).[7]  Moreover, Rule 26(b)(1) provides that the "frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule *shall be limited* by the court if it determines that: (i) the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive."  (emphasis added.)  The Rules thus grant this Court broad discretion to enter protective orders to ensure that discovery is not – as here — exploited to achieve improper purposes.

When the same circumstances have arisen in other cases, district courts have not hesitated to enter protective orders limiting discovery by an adversary from a party's

---

[7] Similarly, Rule 45(c)(1) provides that "[a] party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."

customers.  In <u>Joy Techs., Inc. v. Flakt, Inc.</u>, 772 F. Supp. 842 (D. Del. 1991), for example, the defendant in a patent infringement case sought a "protective order preventing [the plaintiff] from seeking discovery from any customers or potential customers of [the defendant]" without first "mak[ing] a showing that the information it seeks" was both "necessary and relevant to the action" *and* that it could not "be obtained from any other source, particularly [the defendant]." <u>Id</u>. at 849.  In that case, just as here, the defendant argued that the plaintiff's "attempted discovery from [the defendant's] customers [was] a form of harassment which could jeopardize [defendant's] business relationship with its customers." <u>Id</u>.  Rejecting the plaintiff's argument that the defendant "lack[ed] standing to challenge certain discovery requests of third parties," the court granted the protective order and prohibited the plaintiff from seeking discovery from the defendant's customers without first "demonstrat[ing] that it has a specific need for evidence available only from third party customers" of the defendant.  <u>Id</u>.

In similar circumstances, courts have limited not only discovery efforts but other potentially damaging contacts with customers.  In <u>May Coating Technologies, Inc. v. Illinois Tool Works</u>, 157 F.R.D. 55, 56 (D. Minn. 1994), the plaintiff, suing for patent infringement, delivered infringement notices to the defendant's current and future customers.  The defendant thereafter came to believe that the plaintiff was offering the defendant's customers "a full release in exchange for the customer's cooperation in connection with this litigation," trying in effect "to create a *de facto injunction against ITW*." <u>Id</u>. at 56 (emphasis added).  To prevent the damage to its business that such a

scheme would cause, the defendant sought a protective order preventing the plaintiff

"from contacting, communicating, or corresponding with ITW's actual and prospective

customers for *any purpose* relating to this litigation, except through [the defendant's]

attorneys for reasonably necessary discovery." Id. (emphasis added). To ensure that any

legitimate discovery needs would be satisfied, the defendant offered (i) to set up a test site

at one of its customer's facilities to allow the limited discovery that the defendant agreed

might be necessary and (ii) "to cooperate in obtaining from its customers any information

it is unable to provide itself." Id. Just as Kurchatov has done here, the plaintiff in May

Coating flatly rejected this reasonable offer. Based on these facts, the magistrate judge

found "good cause" for issuing the requested protective order. Id. at 57.

## II.    A PROTECTIVE ORDER IS MANIFESTLY APPROPRIATE

### A.    The Kurchatov Subpoenas Are Having and Will Continue To Have a Dramatic and Improper Impact on Western and its Prime Contractor

Through its subpoena campaign, Kurchatov (and its business partner, third-party

defendant GSE) are attempting to use the discovery process to achieve now the ultimate

relief that they (wrongly) seek in this lawsuit: to drive one of the three major competitors

in the simulation software business – DS&S/Western – out of the market. Kurchatov's

efforts (in conjunction with GSE) to exploit the discovery process for business advantage is

virtually identical to those condemned by the Joy Technologies and May Coating courts.

The actual and potential harm from Kurchatov's massive subpoena campaign is not

mere speculation. As set forth above, the actions and statements of several customers

establish that the subpoenas have already harmed DS&S's and Western's goodwill in the

marketplace and damaged existing and potential business relationships (including

potentially lucrative new business relationships with current customers).

1.    **The Subpoenas Are Likely to Give Kurchatov (and GSE) the Fruits of an Injunction — Without Any Court Ruling on the Merits of Kurchatov's Claims**

Many current SimPort customers are presently entertaining – or will soon entertain

– competing bids from DS&S/Western and from GSE for future power plant simulation

work.  Jenkins Decl. ¶¶ 12, 16-18.  On receiving the subpoenas, customers have

questioned whether, even if DS&S and Western have the rights to sell the SimPort

product, it would be simpler to contract with a competitor to avoid being dragged into this

litigation.  As a result, potential customers (including current customers considering new

bids) may determine it is in their best interest to avoid the burdens, however minor, of

being involved in this litigation by refusing to contract with DS&S/Western.  Indeed, the

last thing a potential buyer wants is to be worried that its purchase will land it in court.

2.    **As a Result of the Subpoena Campaign, Some Customers Believe That They Must Now Uninstall SimPort From Their Facilities**

As discussed above, at least one customer (TXU) read the subpoena (probably in

conjunction with the Jody Ryan e-mail) to require it to uninstall the SimPort program that

it acquired from DS&S and Western.  Jenkins Decl. ¶ 15.  Western does not believe that

Kurchatov would be entitled to such draconian relief even if it were ultimately to *prevail*

*on the merits* in this litigation,[8] but it is certainly not entitled to that relief *now*. (Kurchatov has never sought a preliminary injunction or other form of interim relief.)

Nonetheless, TXU contacted DS&S in a panic, believing that it was required to uninstall SimPort now but not knowing how to do so. Id. This episode has already damaged DS&S's and Western's relations with TXU, and there is no way of determining how many other customers are similarly confused.

### 3.    The Subpoena Has Interfered With *Non*-SimPort Business Relationships

This litigation is about rights in SimPort, as it existed in 1997 and as it exists today. But because the subpoenas served by Kurchatov are so broad, customers are being led to believe that this litigation extends beyond SimPort, covering *all* simulation software provided by Western and DS&S. Indeed, as described above, see supra at 7, Vermont Yankee believed that DS&S's rights to RELAP — a wholly separate piece of software to which DS&S holds the exclusive license — were implicated by this litigation, when this case has nothing whatsoever to do with RELAP. Jenkins Decl. ¶ 16.

*        *        *

As these examples illustrate, Kurchatov's subpoena campaign is having the effect of alienating and confusing customers. While Kurchatov's (and GSE's) actions are almost

---

[8] Among other things, the customers are not violating any of the exclusive rights of the copyright owner simply by using the software.

certainly *intended* to have that effect, that they are actually *having* that effect would be enough, even if Kurchatov's intentions were purely innocent. See Joy Technologies, 772 F. Supp. at 849 (imposing protective order related to customer contact even though the court could "not ascertain whether [the plaintiff] [was] seeking discovery from [defendant's] customers in an attempt to harass," where it was "undisputed that [the parties] are fierce competitors in the technology that is the subject of the lawsuit"). Unless a protective order is entered, Western will continue to suffer substantial harm.

**B.    All of the Potentially Relevant Documents That Kurchatov Seeks from the Non-Parties May Be Had from Western — a Party — or from Western's Prime Contractor, DS&S**

The Kurchatov customer subpoenas seek an extremely broad array of documents, many of which — such as "all documents" relating to SimPort software, including years of irrelevant technical materials — would be utterly irrelevant to this lawsuit. In reality, the issues presented by this case require inquiry into only three categories of documents that are arguably within the scope of the subpoenas: (1) the SimPort software that was actually offered and distributed,[9] (2) communications between the customers and the parties about ownership of the software, and (3) contracts and other documentation demonstrating the amount paid. All three categories of documents can be amply satisfied by discovery from Western (a party) or from DS&S or SAIC.

---

[9] Notably, Western has already produced the SimPort software code itself.

1.      **Software**

Counsel for Kurchatov has stated that one purpose of the subpoenas was to obtain a copy of the SimPort software as it was delivered to each of the customers (referred to as "data loads"). But this claimed need provides no basis whatsoever for Kurchatov's harassment of Western's customers.

First, the data loads are not relevant to the litigation. The data loads are simply customized versions of the basic SimPort software, in which various SimPort modules are adapted to the circumstances of a particular power plant. Jenkins Decl. ¶ 8. Western has already produced the software that actually *is* at issue, namely, certain iterations of the SimPort software itself. See Exs. 8 & 9.

Second, even if the data loads *were* relevant to the litigation, Kurchatov does not need to obtain them from customers. Western retains copies of its customers' data loads, and indeed, Western's copy includes a full version of the SimPort source code, while the customer's version includes only a portion of that same code. Similarly, DS&S also has copies of the data loads and is willing to produce them. If Kurchatov truly believes this information is relevant and necessary to the litigation, it can pursue it from Western or DS&S, each of whom have offered to produce the pertinent information if Kurchatov withdraws the customer subpoenas. Instead, Kurchatov seeks to circumvent Western's legitimate relevancy objections by seeking the information directly from customers, thereby imposing needless discovery burdens on customers in a manner highly likely to cause one-sided business harm to Western and its prime contractor.

Furthermore, *Kurchatov itself already has* at least two of the data loads it is demanding from customers.  As GSE admits in its answer to Western's counterclaim, persons described as "Kurchatov's engineers" obtained "the data loads for Sherco, Armstrong and Arnot" power plants.  GSE Answer ¶ 34.  The first two data loads are those that Kurchatov — redundantly — demands from Allegheny Energy Supply Company LLC and Xcel Energy Corp. respectively.

### 2.    Communications

Similarly, any communications that are conceivably relevant to this litigation would be in the possession of the parties or of DS&S.  The copyright infringement claims (and claims based on similar allegations), of course, do not depend at all on communications between Western, DS&S, or SAIC and their customers.  The ownership of the software will be determined based on the software itself and the circumstances of its creation.  Similarly, whether one software program infringes another will depend on the programs themselves, not on anything that happened at a particular customer's power plant.  At most, communications with customers in which one of the parties made assertions about ownership of the software might be relevant — but Western and DS&S are fully prepared to produce any such communications.

### 3.    Contracts

Western has already produced all of its sub-contracts relating to the subpoenaed customers.  Moreover, DS&S is in possession of all of the pertinent prime contracts and

records of payments made by customers, and stands ready to produce them (subject to any

confidentiality obligations to customers).

## III.    THE REASONS GIVEN BY KURCHATOV FOR PURSUING CUSTOMER SUBPOENAS ARE PLAINLY PRETEXTUAL

Kurchatov's outside counsel apparently first learned of the possibility of DS&S's

offer from a subpoena target, who informed him that DS&S was prepared to offer

responsive relevant documents if Kurchatov withdrew its subpoena.  Kurchatov's counsel

initially indicated to DS&S that this approach was attractive.  But after DS&S's counsel

contacted Kurchatov's counsel to negotiate the terms of such an agreement, Kurchatov's

counsel completely refused even to discuss the possibility of reducing burdens on

customers.  See Ex. 6 (attaching letter from John M.G. Murphy, Esq. to Thomas P. Olson,

Esq., dated June 23, 2003).  Kurchatov rebuffed a similar offer by Western.  Ex. 7.

Instead, without even attempting to discuss the scope of any voluntary production,

Kurchatov's counsel simply announced that they planned — belatedly — to serve

subpoenas on DS&S and SAIC.  Ex. 6. (In a rational discovery plan, such subpoenas would

have been served before any subpoenas were served on customers.)  Yet, the letter

announcing this intent best demonstrates why *any* discovery should be directed only at

Western or at DS&S.

Kurchatov's counsel offers no rational explanation for why the discovery sought

from the DS&S/ Western customers could not just as easily be had from Western or DS&S.

Instead, Kurchatov's counsel offers two feeble explanations.  *First*, he asserts that the

"finder of fact will greatly benefit from comparing DS&S's and SAIC's anticipated

18

testimony" with that of the subpoena recipients.  <u>Id</u>.  According to the letter, document discovery from the non-party power plants is supposedly necessary because "there is no way that DS&S and SAIC could present the finder of fact with an accurate and credible comparison of the testimony, and neither could anyone else, unless the purchasing entity's testimony is obtained."  <u>Id</u>.  But this entire argument is an utter *non sequitur*:  the subpoenas do not seek testimony, but documents, which will speak for themselves no matter who produces them.  Further, even assuming the subpoenas sought testimony, Kurchatov's counsel made no possible showing that any such testimony would be remotely relevant to Kurchatov's claims.

*Second*, Kurchatov's lawyer asserts that "much of the information sought from the purchasing entities is information only they possess."  <u>Id</u>.  Struggling to come up with an example of what "information" this would include, he can only identify "internal communications regarding the software and joint funding information between the purchasing entities and third parties."  <u>Id</u>.  The first category — "internal communications regarding the software" — is not remotely relevant to the issues in this litigation.  What employees of a SimPort customer happen to say to each other about SimPort has no bearing on whether SimPort infringes any of Kurchatov's purported rights.  And the second category, to the extent it can be deciphered, also misses the mark:  "joint funding information" between two non-parties has no potential bearing on the question whether any of the plaintiffs' purported rights have been infringed by the defendants.

19

Kurchatov's outright refusal to engage in negotiations to limit the burden on all of DS&S and Western customers — and its inability to articulate a single sensible reason for refusing to do so in its correspondence with DS&S — shows its bad faith in serving the subpoenas and illustrates the urgent need for the Court to prevent Kurchatov from abusing the discovery process for improper business purposes.

## **CONCLUSION**

For the foregoing reasons, Western respectfully requests that the Court enter a Protective Order requiring Kurchatov to withdraw any pending subpoenas to customers, prohibiting Kurchatov and GSE from serving discovery requests on non-party customers or potential customers of Western or DS&S without first seeking the consent of Western and, if no agreement is possible, then demonstrating to the Court that the proposed discovery is relevant and necessary and could not be produced by Western, DS&S, or SAIC.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By:     _____/s/_____
       Bruce R. Genderson (Bar No. 02427)
       Margaret A. Keeley (Bar No. 15654)
       Ann Sagerson (Bar No. 15821)

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Counsel for Western Services Corporation and
George Utmel*

Dated: July 17, 2003

## __Local Rule 104.7 Certification__

I, Margaret A. Keeley, certify that John Murphy, counsel for Kurchatov, and I conferred by telephone on July 16, 2003 concerning the third-party subpoenas _duces_ _tecum_ issued by Kurchatov.  We also exchanged messages concerning the same on July 17, 2003. Mr. Murphy stated that Kurchatov might consider putting a few of the subpoenas on hold, and then reconsider the breadth of those subpoenas after it reviewed documents produced by Western and DS&S, but that it would not consider such a resolution as to all subpoenas issued to customers.

_____/s/_____
Margaret A. Keeley

## **Index of Exhibits**

1. Declaration of Thomas W. Jenkins

2. E-mail from Jody Ryan

3. Third Party Subpoenas

4. June 20, 2003 Letter from Thomas P. Olson (counsel for DS&S) to John M.G. Murphy (counsel for Kurchatov)

5. June 26, 2003 Letter from Ann N. Sagerson (counsel for Western) to Jesse B. Hammock (counsel for Kurchatov)

6. June 23, 2003 Letter from John M.G. Murphy (counsel for Kurchatov) to Thomas Olson (counsel for DS&S)

7. June 30, 2003 Letter from Jesse B. Hammock (counsel for Kurchatov) to Margaret A. Keeley (counsel for Western)

8. June 13, 2003 Letter from Jesse B. Hammock (counsel for Kurchatov) to Margaret A. Keeley (counsel for Western)

9. July 8, 2003 Letter from Margaret A. Keeley (counsel for Western) to John M.G. Murphy (counsel for Kurchatov) and Charles L. Simmons, Jr. (counsel for GSE)