IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| RUSSIAN RESEARCH CENTER<br>THE KURCHATOV INSTITUTE,<br><br>    Plaintiff,<br><br>v.<br><br>WESTERN SERVICES CORP., et al.,<br><br>    Defendants and<br>    Third-Party Plaintiff,<br>v.<br><br>GSE SYSTEMS, INC.<br><br>    Third-Party<br>    Defendants. | Case No.: AMD 02-3878 |

## DECLARATION OF THOMAS W. JENKINS

1. My name is Thomas W. Jenkins. I am at least eighteen years of age and if called to testify I could and would testify to the facts set forth below.

2. In 1974, I graduated from Pennsylvania State University with a Bachelor of Science in Electrical Engineering. I have worked as an engineer and in business development for simulation projects for more than 25 years.

3. I am currently the Vice President for Business Development of Data Systems & Solutions. (DS&S is a joint venture formed by Science Applications International Corporation ("SAIC") and Rolls Royce.) In that capacity, I am intimately familiar with the DS&S's business relationships with its current and prospective customers for power plant simulation software.

4. I have been in the business of developing and selling power plant simulation systems since 1979. First as an SAIC employee and then with DS&S, I have worked with Western Services Corporation ("Western") since 1997 to develop and market simulation software called "SimPort" in the United States.

5. Although some of the labor in creating the 1997 version of SimPort was supplied by Russian engineers sent to the United States by the Kurchatov Institute, the engineers worked under Western's and SAIC's direction, and virtually the entire cost of developing and marketing SimPort was borne by SAIC and Western.

6. During the entire period since 1997, Western and SAIC/DS&S have worked hand in hand to develop SimPort. While DS&S handled most of the marketing, Western (acting as DS&S's subcontractor), supplied the bulk of the labor and engineering skills.

7. Although SAIC and then DS&S always called their simulation product SimPort, the software has in fact gone through fairly dramatic changes. In fact, beginning in 1999, the software was completely overhauled and essentially rewritten from scratch. DS&S has come to refer to the earlier SimPort as "SimPort 1997" and the later SimPort as "SimPort 2000."

8. Power plant customers do not buy SimPort software or tools as standalone, ready-to-run programs. Instead, DS&S and Western customize the software for each customer; while a portion of the SimPort code is embedded in the system that is delivered to each of the customers, the simulation system also includes a large amount of data about the customer's power plant, much of which is highly proprietary. The software that is actually delivered to the customers is referred to as the "data load."

9. Ever since The Kurchatov Institute filed its lawsuit, a substantial part of my time as well as that of my colleagues at DS&S has been spent reassuring current and prospective customers about the lawsuit.

10. In the last several weeks, I have spent substantial time talking with current and potential customers about the subpoenas that Kurchatov served on them. The subpoenas are causing a substantial adverse reaction among DS&S's and Western's current and prospective customers. Even customers who recognize that Kurchatov's litigation has no merit are nonetheless frustrated at being brought into the litigation and have indicated that they may prefer to avoid dealing with DS&S and Western rather than risk harassment from Kurchatov or its new business partner, GSE Systems Inc. ("GSE").

11. There are three principal companies that offer simulation software to domestic power plants: DS&S, GSE, and a Canadian company called CAE. DS&S offers SimPort. To my knowledge, GSE has not sold or installed any version of SimPort to any customer in the United States; rather, GSE has sold other simulation packages. And while Kurchatov is the nominal plaintiff, it has never sold SimPort software to any customers in the United States except in conjunction with DS&S, SAIC, and Western.

12. DS&S/Western, CAE, and GSE regularly submit bids for the same contracts. Each contract is worth hundreds of thousands (if not millions) of dollars in revenues.

13. Shortly after Kurchatov filed its lawsuit, Jody Ryan, a GSE executive, sent an email to many of DS&S's customers suggesting that they were now -- or would imminently be -- under an obligation to remove from their computers the SimPort software they had purchased from DS&S. The email reads as follows:


> Hi Guys,
>
> In late November Kurchatov Institute filed a lawsuit in the Federal Circuit Court in Baltimore. They are suing Western Services Corporation and others over SimPort. They are asking that anyone who has received SimPort from Western Services or received it from anyone associated with Western Services stop using SimPort and destroy all copies. I do not know any more than this, and I am not a legal expert, so I have no advice or opinions to offer. I am sure that there is a way to get a copy of the filing, since it is public, but I am not sure how to do it. Sorry to bring bad news during the holiday season. Hope all of you had a great Thanksgiving, and hope you and your families have a wonderful Christmas.

14. More recently, Kurchatov has aggressively served subpoenas on more than a dozen customers of DS&S/Western. The subpoenas have already -- and even before Kurchatov has pursued any motion to compel -- caused substantial damage to DS&S's and Western's goodwill and position in the marketplace.

15. For example, TXU Electric was one of the companies that received Jody Ryan's e-mail. After receiving a subpoena from Kurchatov's lawyers in connection this lawsuit, a TXU representative contacted DS&S, expressed his belief that the subpoena required TXU to uninstall SimPort, and sought DS&S's guidance as to how to do so. This conclusion, of course, paralleled the "advice" given by Jody Ryan to TXU and other companies in the email quoted above.

16. Another customer, Vermont Yankee Nuclear Power Corporation ("Vermont Yankee"), concluded, based on receipt of a subpoena from Kurchatov, that this litigation might jeopardize DS&S's right to offer RELAP. In fact, RELAP is an entirely distinct piece of software offered by DS&S under an exclusive license from an unrelated company, and is not at issue in this lawsuit.

17. These are simply examples of some of the reactions we have heard to the subpoenas. In addition to those we have heard from, I think it is highly likely that other customers are having similar reactions, without reporting them to us. I also believe, based on communications with DS&S's current and prospective customers, that DS&S and Western have lost bids for power plant simulators because of customer concerns raised by the Jody Ryan email or other communications from GSE or KI.

18. DS&S is currently in competition with GSE for two major contracts for power plants that are already customers of DS&S. Kurchatov has served its subpoenas on both of these customers. I understand these subpoenas were served by Kurchatov after final bids were submitted to both of these customers by DS&S. Given the events at TXU and Vermont Yankee, it seems highly likely the customers' receipt of these subpoenas will impact the customers' selection between the two competing bids of GSE and DS&S.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on July 14, 2003.

_____
Thomas W. Jenkins