IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| RUSSIAN RESEARCH CENTER ) <br> THE KURCHATOV INSTITUTE ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) Case No.: 02CV3878 <br> WESTERN SERVICES CORPORATION, ) <br> et al. ) <br> ) <br> Defendants. ) | |

**PLAINTIFF'S OPPOSITION TO THE**
**DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

Plaintiff Russian Research Center, The Kurchatov Institute ("KI"), by its undersigned attorneys, hereby opposes Defendants and Counter-Plaintiffs George Utmel's ("Utmel") and Western Services Corporation's ("WSC") Motion for Protective Order, and as grounds therefore, states as follows.

**INTRODUCTION**

At heart, this case concerns WSC's illegal and improper sale and licensing of KI's software. KI seeks evidence of those infringing transactions, both to evaluate the extent of the copying itself, and to examine the profits WSC made from KI's intellectual property, among other things. It seems somewhat obvious that such evidence is directly relevant to a copyright case such as this one; nevertheless, instead of engaging in the

493188.4

expeditious and inexpensive exchange of discoverable evidence as contemplated by the Rules, WSC has repeatedly set up roadblocks.

First, WSC refused to produce any more than the first and last versions of one of the infringing products, instructing undersigned counsel that this was "all he would need" to conclude that WSC acted properly. Later, WSC claimed that, contrary to industry practices and norms, WSC actually did not save any intermediate versions of its software, so nothing more could be produced. Now, WSC erects perhaps the ultimate barrier in this effort – a motion for a protective order barring all discovery of any of WSC's customers. If successful, WSC's efforts will have perfectly prevented the finders of fact from hearing any evidence other than that which WSC wants them to hear. They will hear no evidence from independent third parties actually involved in the infringing transactions, and no evidence of the evolution of the infringing software from the first to the current versions – nothing but documentation selected, screened, evaluated and packaged by WSC's own Washington, D.C. counsel – and much of that missing.

This, of course, would be a wonderful coup for WSC's counsel. It would also be the death knell of justice in this case. The point of this lawsuit is to find the truth. Many courts, at many times, in many different circumstances, have recognized that the exclusion of evidence hinders the search for

truth, and must be approached with great caution. KI is not "roam[ing] in the shadow zones of relevancy" with its discovery, as one court colorfully put it.[1] Rather, by requesting discovery from third parties directly involved in the infringing transactions, KI seeks to supply the jury with an *independent* source of evidence of its claims, so that the jury might evaluate, test and compare with it other evidence presented in this matter, and thus do justice.

To bar the jury from access to such evidence, WSC must come forward with very weighty and compelling considerations. It has failed to do so on many levels, including its own standing and the merits of its purported exigency. The interests of justice thus require that WSC's motion be denied.

## BACKGROUND

KI brought this litigation because of WSC's unauthorized use and licensing of simulation software known as SIMPORT, and WSC's failure to pay KI any portion of the millions of dollars WSC has earned licensing this software. WSC does not deny that it has licensed and/or otherwise marketed simulation software known as SIMPORT, instead, it alleges that the simulation software that it licensed as SIMPORT was developed by WSC wholly independent of KI's software.

---

[1]  Broadway & Ninety-Six Street Realty Co. v. Loews, Inc., 21 F.R.D. 347, 352 (S.D.N.Y. 1958).

WSC's theory might seem at least possible if not for the history of both companies and their extensive relationship involving simulation software.[2] WSC, which consisted of little more than Utmel when incorporated in 1995, does not deny that it worked with KI for nearly 4 years (starting in 1996) to bring KI's simulation software to western markets. During this time, WSC engaged in extensive negotiations to obtain a license from KI for use of KI's software, but these negotiations failed. WSC likewise does not deny that it brought numerous KI employees to the United States, obtained visas for them, and provided facilities so KI's employees could work on simulation software licensed to various plants by WSC's partner, SAIC.[3] Utmel and

---

[2] KI is the first Russian national research institute. It is known throughout the world for its production and promotion of, among other things, nuclear and fossil fuel power plant technology. This technology includes its simulation software, eventually known as SIMPORT. KI began development of SIMPORT's predecessor, AIS '95 in the late eighties and early nineties.

In 1996, KI was approached by SAIC and WSC. Both companies offered to act as a conduit to introduce KI's simulation software to western markets: WSC would arrange for work-visas, housing, meals, travel and work facilities for KI's scientists and SAIC would act as the promotional arm, using its extensive contacts in the power plant industry to solicit potential licensees.

When George Utmel, as president of WSC, approached KI in 1996, WSC consisted of little more than him. Contemporaneous with his meeting with KI as WSC's president, Utmel was an employee of SAIC and WSC's "offices," the same offices it and Utmel later provided for KI's visiting employees, were within SAIC's offices, located in Frederick, Maryland.

[3] It must be noted that WSC's facilities, at which KI employees worked for over two years, is housed within SAIC/DS&S facilities located in Frederick Maryland.

WSC also do not deny that they hired several of KI's employees that WSC brought to the United States. WSC cannot deny that the software it and DS&S marketed and licensed beginning in 1997 was based wholly on KI's SIMPORT and modified for the various power plants by KI's visiting and Russian-based scientists. Nonetheless, despite its intimate connection with and longstanding use of KI's software, WSC claims that it developed new software (SIMPORT 2000) *wholly devoid of any reliance on KI's SIMPORT.*

Despite this (or maybe because of it) WSC asks this Court to prevent KI from seeking discovery from the very power plants to which WSC sold the infringing software, which KI needs to determine the extent of WSC's infringement and to prove the amount of KI's damages.[4] In order for this Court to issue the Rule 26(c) protective order sought by WSC, WSC must show "good cause." See, e.g., May Coating Tech., Inc., v. Illinois Tool Works, 157 F.R.D. 55, 57 (1994). Here, WSC has not shown good cause. Instead, WSC offers little more than accusations, innuendo and the self-serving affidavit of a DS&S employee. For these reasons, the order sought by WSC and Utmel should be

---

[4] The need is obviously more pronounced given WSC's refusal to produce a broad range of documents identified above and in KI's pending, or soon to be filed, Motion to Compel.

493188.4                                5

denied, and discovery should proceed according to the federal rules.

### WSC'S MOTION FOR PROTECTIVE ORDER

Undersigned counsel has caused subpoenas to be served upon several power plants known to have purchased the infringing software, as a completely routine task in the preparation of this one of his many lawsuits.  The purpose of the subpoenas (for documents only) was to secure from a third party copies of the infringing software for examination, as well as to obtain correspondence and communication, internal and external, concerning the software and its purchase, among other things.  Evidence of both liability and damages, obtained from a third party source, could be expected to be obtained through such efforts.  As the Court surely knows, efforts such as this are undertaken in nearly all lawsuits of this nature.

The routine nature of this task perhaps left counsel completely unprepared for the ferociousness of the attack by WSC on KI's discovery efforts.  WSC begins by captioning its motion as seeking protection against "abusive" third party discovery.  WSC states that KI (and third party GSE) has "used the *artifice* of this lawsuit and other anticompetitive means" for the singular purpose of driving customers from WSC and its partner,

DS&S.[5]  See WSC's Motion For Protective Order at p.4 (emphasis supplied).  WSC mischaracterizes KI's third party discovery as "simply another improper and abusive tactic" that the two have "deployed" in a continuing effort to harm WSC and DS&S's business.  Id.  WSC alleges that the third party discovery has caused "tremendous concern and confusion" among the various power plants to whom it is directed.  WSC alleges that KI's counsel "struggled" to come up with what WSC would consider a suitable explanation for its need to seek discovery from the plants that KI alleges WSC illegally licensed KI's software.  WSC claims KI's counsel's alleged "outright refusal to engage in negotiations" regarding withdraw of the subpoenas shows "bad faith."[6]

---

[5]  WSC's numerous allegations that KI continues to pollute WSC's market for simulation software misses one critical point:  the numerous power plants at issue are also customers or potential customers of KI and GSE.  Both GSE and KI continue to market many products, including KI's SIMPORT, to these plants.  KI does not gain by causing alleged mass confusion among its potential customers.  KI agrees with WSC's assertion that the nuclear and fossil fuel power plant "community" is a small one.  Most of the customers and potential customers of KI are well aware that there are substantial questions regarding the ownership of SIMPORT that will likely be resolved by this Court.  Any uncertainty that befalls WSC and DS&S because of the litigation falls equally on KI.  Unfortunately, in litigation such as this, it is an inevitable outcome that some potential customers will become aware of the litigation between the parties, and because of them, may avoid doing business with either side, KI or WSC.

[6]  WSC's allegation that KI's negotiations regarding the subpoenas was in bad faith is incorrect.  KI has requested numerous categories of documents and software from the power plants that WSC either refuses or cannot produce.  Primarily, KI has requested internal communications, all external communications with WSC and/or DS&S,

493188.4                                   7

The level of WSC's vitriol is astonishing, particularly to the attorney supposedly responsible for all these Machiavellian machinations. The undersigned humbly represents to the Court within the duties imposed upon him by his professional responsibility that he held absolutely *none* of the nefarious motives attributed to him by WSC. The subpoenas were served as a proper, necessary and routine part of preparing this case. Moreover, undersigned counsel neither knows much or cares much about the business practices of any of these industry participants apart from that which is relevant and necessary to bring this case to the jury. In fact, KI's actual communications with the power plants, and their subsequent production of documents, tell a very different story from that spun by WSC; in effect, it tells the rest of the story.

Ultimately, a critical fault with WSC's motion is that, at least in part, it seeks relief on behalf of other parties, the named power plants, that have not requested relief themselves, and do not appear to want or need it. The relief is also sought from this Court, which did not issue the subpoenas WSC wants the Court to quash. In doing so, WSC unnecessarily involves the Court in a dispute that is not WSC's to fight, may not need to

---

copies of all software licensed to them under the mark SIMPORT and all invoices between the respective plants and/or WSC and DS&S.

493188.4                                8

be fought, and, KI respectfully submits, which may not be this Court's to resolve.

If the power plants cited by WSC felt that the discovery propounded by KI is oppressive and overly burdensome, they were free to seek judicial relief in the respective courts that issued the subpoenas; but, they did not. Instead, the very same power plants cited by WSC as supporting its motion have produced or agreed to produce responsive documents after communication between their counsel and KI's counsel, belying the mass confusion and hysteria WSC pictures. Many of the power plants requested more specific information to assist them in finding the discovery sought, and KI's counsel provided it. None of the attorneys for the respective plants stated that their clients were confused by the subpoenas or worried that they needed to "unload" the software from their computers. In fact, counsel for many of the power plants, apparently uninformed of the litigation by either WSC or DS&S, asked for copies of the pleadings in the case, which were provided. Nonetheless, WSC now asks this Court to order that KI withdraw the subpoenas issued by nearly a dozen other federal district courts, and for the most part, already responded to.

In any litigation between business competitors, especially when involving claims of intellectual property infringement, discovery will likely be sought from entities other than the

immediate parties. It is quite logical where, as here, a party is alleged to have infringed intellectual property rights by improperly selling or licensing an infringing product, that the communications and allegedly infringing goods would be sought for review. Notwithstanding this necessity, WSC attempts to erect a wall between the power plants that it has or plans to market the software to, by pledging that it will produce everything that KI requests from the third parties.[7]

WSC's promises ring hollow, however, because a material part of the discovery sought from the plants can only be provided by them, and WSC has refused and/or failed to produce the remainder. Thus, while refusing to produce the responsive discovery requested from it, WSC offers to present evidence sought from others and asks this Court to block KI from gaining additional or corroborating discovery from its most logical (and presumably most reliable) source: the power plants to whom WSC

---

[7] WSC's motion suggests that any time discovery is sought from an alleged "customer," a protective order is appropriate. Surely, anytime a plaintiff in a copyright suit seeks to obtain copies of the improperly licensed copyrighted work or documents related thereto, the defendant can claim that the plaintiff is doing nothing more than seeking to interfere with its business. But where, as here, the facts so clearly show the potential for infringement (for example, the *prima facie* element of access to the work), the spirit, if not the words of the federal discovery rules demand that open discovery be conducted. This case is not like those cited by WSC in support of its motion. WSC presents nothing more than improper accusations and the self-serving affidavit of an employee of its "partner" DS&S (who is scheduled to be deposed in this case), to support its accusations of substantial confusion.

and DS&S have improperly licensed or intend to improperly license the infringing software. For these reasons, WSC's motion must be denied and discovery must continue.

## WSC LACKS STANDING TO OBJECT TO THE THIRD PARTY DISCOVERY

Initially, it appears that WSC and Utmel seek to fight a battle that is not theirs to fight. Stated simply, neither Utmel nor WSC have standing to object on behalf of the power plants. See Clayton Brokerage Co., Inc. v. Clement, 87 F.R.D. 569 (D. Md. 1980) ("the defendant lacks standing to ... challenge ... the [third party] subpoena"); Sneirson v. Chemical Bank, 108 F.R.D. 159 (D. Del. 1985). As the federal district court in Delaware stated:

> Ordinarily, a party has no standing to object to discovery of a nonparty. However, an exception exists where a party claims some personal right of privilege in respect to the subject matter of a *subpoena duces tecum* directed to a nonparty.

Sneirson at 160, n.2, (quotations omitted); see also, Windsor v. Martindale, 175 F.R.D. 665, 668 (D. Colo. 1997) (defendant lacked standing to move to quash a subpoena duces tecum to a nonparty because the defendant did not claim that the documents sought were privileged or invaded privacy interests).

Here, WSC has not asserted any "personal right of privilege" regarding the discovery sought. Instead, WSC makes bald allegations that the power plants are hysterical and

confused, and that KI and others have improper motives for issuing the discovery. Apparently aware that it lacks standing to object on behalf of the power plants, WSC alleges that the subpoenas are no more than a continuing campaign (which WSC alleges began when KI filed the complaint) aimed only at harming WSC and DS&S's business. WSC purportedly seeks the protective order to remedy this alleged harm. These allegations wholly miss the point of this suit.[8]

---

[8]    It also appears that WSC may have made these allegations in an attempt to analogize this case to two federal district court cases WSC cites as authority for its motion. See May Coating Tech., Inc., v. Illinois Tool Works, 157 F.R.D. 55 (D. Minn. 1994); Joy Tech, Inc., v. Flakt, Inc., 772 F. Supp. 842 (D. Del. 1991). The facts of both cases are distinguishable.

In May Coating, the plaintiff issued a press release that was distributed to many of the defendant's customers concerning the litigation shortly after filing suit. Thereafter, the plaintiff sent "infringement letters" to the defendant's customers and potential customers. Id. at 56. The plaintiff offered each customer a "full release" from liability if the customer would cooperate and provide evidence. Id. To forestall the plaintiff's contact with its customers, the defendant offered to produce every document sought, whether the defendant possessed it or its customers. In other words, the defendant volunteered to obtain all the discovery that was requested from the customers on its own and provide it to the plaintiff. The defendant also offered the plaintiff the opportunity to visit a customer's work-site to test an alleged infringing machine. Id. at 57. Notwithstanding, the plaintiff refused the defendant's offer, and the defendant sought a protective order.

Here, KI has not engaged in the type of conduct the May Coating court found sufficient to issue a protective order. KI has not issued press releases regarding the lawsuit. KI did not send "infringement letters" to the customers, and KI certainly has not offered any inducement to get the customers to provide evidence. WSC has offered to produce only the software sought from the power plants, not the communications (internal and external) or the invoices and communications with DS&S/SAIC. WSC certainly has not offered access to a customer's jobsite.

In Joy Tech., the plaintiff in a patent suit sought discovery from the defendant's customers. Unfortunately, the published opinion does not disclose the discovery sought. Ultimately, the defendant

493188.4                                12

This case is about software infringement, not about obtaining a competitive edge in the market place. The ultimate issue will be whether KI can prove that WSC improperly copied or made unauthorized derivative works of KI's SIMPORT, and licensed it without KI's consent. At some point the Court and/or a jury will have to determine if WSC made such improper use of KI's SIMPORT and licensed it to the power plants at issue (thus evidencing damages), by comparing the respective parties' versions of SIMPORT.

In anticipation of providing the evidence necessary to make this case to the Court and the jury, KI sought production of each successive and incremental version of WSC's SIMPORT from WSC.[9] In response, WSC refused to produce anything other than what it purported is the first and last versions of SIMPORT 2000

---

sought a protective order based on its claims (unexplained in the decision) that the discovery was intended for the improper purpose of harassing the defendant's clients. Ultimately, the court granted the defendant's motion for protective order because it found that the plaintiff failed to show why the unspecified discovery could not be gained from the defendant and could not establish that the discovery was not was for more than the purpose of harassing the customers.
   Here, KI seeks copies of software and documents that (1) only the power plants possess; (2) that WSC has steadfastly refused to produce on its own; and, (3) that WSC claims should have been sought from DS&S, which is not a party to this lawsuit. None of WSC's cases are apposite.

[9]   SIMPORT consists of literally millions of lines of computer code. If KI is to prove that WSC's SIMPORT derived from KI's SIMPORT, it is necessary to review the beginning versions of WSC's SIMPORT and trace its evolution. Otherwise, over time, the vast majority of lines can be altered and changed, thus making the end result appear substantially different from its origins, or, in other words, the software from which it was derived.

493188.4                                13

and what it claims is the only remaining version of SIMPORT 1997. To justify its offer of less than complete production, WSC's counsel claimed that what it offered is all the software that is needed to do the necessary analyses.[10]

Initially, WSC also refused to produce any other "version" of SIMPORT because it claimed the numerous versions it retains are almost identical. WSC reasoned that production of each version is not necessary because it is, for the most part, duplicative. After becoming concerned by the subpoenas, however, WSC changed its tune, offering to produce the allegedly duplicative software if KI would withdraw each third party subpoena in its entirety. Of course, no one can evaluate the accuracy of WSC's representations, because no one administering this action, other than WSC, has ever seen the evidence. Notwithstanding that, WSC's offer failed (and continues to fail) to address the discovery sought from the plants other than the software, and ignores that WSC and Utmel *still refuse to produce* discovery sought directly from them. Quite apart from the software issue, WSC has not produced or offered to produce its communications with the plants, and has not stated how it

---

[10] It can thus be seen that opposing counsel has engaged in a pattern of dictating to the undersigned and this court what evidence is necessary for the just resolution of this case. Obviously, to accept these dictates undermines the very foundations of our adversary system.

believes it can produce each plant's internal communications (obviously it cannot).

Naturally, communications between WSC, DS&S and the power plants are relevant and necessary discovery. These communications will undoubtedly shed light on WSC and DS&S's representations regarding their rights to license SIMPORT, among other things. KI has requested this communication from WSC, but WSC has steadfastly refused and has failed to produce it to this day. Just as important as WSC's and DS&S's communications with the plants, however, are the internal communications within each plant regarding the licensing of the software, which may disclose representations by WSC and communication with it and others regarding the infringing software. Needless to say, neither WSC nor DS&S can produce its customers' internal communications.

Aside from questioning KI's need to obtain software from the power plants, WSC also (improperly) questions the necessity of the additional evidence sought by KI through the subpoenas. To properly prepare a case for this Court and a jury, KI must have access to all discovery likely to lead to admissible evidence, as the federal rules provide. In pursuit of this, KI issued subpoenas duces tecum to the plants and have engaged in ongoing, good faith and mostly productive discussions regarding their production. Documentation relating to and generated in

493188.4                              15

the course of the infringing transactions that are the heart of this case surely cannot be considered so removed from the subject matter to warrant the extreme remedy of complete denial of discovery as sought by WSC.

### THE POWER PLANTS CITED BY WSC HAVE NOT BEEN HARASSED, HAVE NOT OBJECTED AND HAVE PRODUCED OR HAVE AGREED TO PRODUCE RESPONSIVE DOCUMENTS

As the only specific examples illustrating why it needs the instant protective order, WSC cites to its "panic[ked]" customer Texas Utilities ("TXU") and an alleged misunderstanding by another power plant, Vermont Yankee Nuclear Power Corporation ("Vermont Yankee"), which allegedly mistakenly believed this litigation involved software other than SIMPORT.[11] Presumably, WSC has clarified whatever alleged misunderstanding the unnamed Vermont Yankee employee may have had regarding the subpoena, by providing copies of the pleadings or otherwise. But as to TXU, WSC tells only a fragment of the story. When placed in the proper context, this Court will readily see that issuance of the

---

[11] WSC makes bold but baseless allegations that service of subpoenas to two other unnamed power plants was "strategically timed" by counsel to occur after DS&S's final bid for prospective work. The undersigned can confidently state to this Court that no such strategy was employed, nor was such unethical conduct even contemplated. To suggest that undersigned counsel would have the wherewithal, not to mention the time, to engage in such minute intelligence in just one of his many cases so as to discover the specifics of one WSC bid to one power plant is, quite frankly, flattering – but, it also suggests what can only be described as an unwarranted degree of paranoia on the part of WSC and its counsel.

493188.4                              16

subpoenas followed a logical discovery plan, and was prompted only by a motive to uncover admissible evidence in this case.

On April 18, 2003, KI propounded requests for production on WSC seeking, among other things, all copies of SIMPORT and all communications and documents regarding the development and licensing any software under the trademark SIMPORT. On May 21, 2003, WSC responded to KI's requests by stating that it would only produce limited versions of WSC's SIMPORT and would not produce the communications sought because it alleged the request is overly broad and unduly burdensome. During this time, counsel for KI also began executing subpoenas to obtain discovery from the various power plants to which WSC has licensed SIMPORT. Thereafter, on May 29, 2003, the custodian of records for TXU was served with one of the subpoenas now at issue.

Recently, counsel for KI and counsel for TXU spoke regarding the subpoena. TXU's counsel stated his client was willing to produce any responsive documents in its custody or control. <u>See</u> Letter to Steve Boyd, attached as Exhibit A. Notably, TXU did not object to the subpoena, and has made no reference to any alleged confusion regarding the necessity to "uninstall" SIMPORT, as alleged by WSC. Instead, counsel stated that his client would search for responsive documents and produce any that are discovered by mid-August. When produced to

493188.4                              17

KI, the documents will be provided to counsel for WSC (as all other documents obtained by the third party subpoenas have been), at WSC's expense, consistent with the parties agreement and KI's obligations pursuant to the federal rules.

Similarly, with respect to Vermont Yankee, counsel for Vermont Yankee contacted KI's counsel regarding its willingness to produce responsive requested documents. Vermont Yankee did not object and has produced all responsive documents in its custody and control. Counsel for Vermont Yankee never inquired whether this litigation dealt with software other than SIMPORT and was never informed as such.

Clearly the conduct of Vermont Yankee and TXU does not reflect the allegations of mass confusion and destructive misinformation alleged by WSC. In fact, it is quite typical of discovery in heavily contested complex litigation between two large companies involving claims of infringed intellectual property, and it seems that, by and large, the power plants have taken it in stride. See, e.g., Letter from Ann L. Pharr, Senior Counsel Northrup Gumman, Newport News, attached as Exhibit B.

Finally, in an attempt to cast further aspersions on the motivations of KI or its counsel, WSC states (citing to an affidavit no less) that it believes service of the two "other" subpoenas served on unnamed power plants was "strategically timed" to cause direct harm to DS&S and WSC's business (which

493188.4

18

plants, by the way, have not sought this or any other court's protection). By proffering this statement and relying on an affidavit, swearing as to the truth of the representations under oath, the affiant (and WSC's counsel) of course represents that he is in possession of facts that support his "belief" that undersigned counsel intentionally engaged in conduct that could only be described as unprofessional and unethical. KI did not serve the subpoenas, nor did KI choose the "timing" of the source – the undersigned did. Undersigned counsel can unequivocally state, as explained earlier, that his intentions regarding the subpoenas were entirely proper, he knew nothing of any bid nor did he care about the same, and absolutely no facts could exist to support the scandalous belief to which the affiant swears under oath. Counsel would therefore request that the Court inquire further into the affidavit, requiring the affiant (or WSC's counsel) to produce all facts upon which he bases his sworn "belief", not just as to the bid or service of the subpoena, but as to why he contends undersigned counsel knew anything about this, and intended the interference Ms. Keeley alleges. <u>See</u> WSC's Motion for Protective Order at p.7. If she is unable to show any such knowledge on behalf of undersigned counsel, the Court should take appropriate action.

## CONCLUSION

If justice is to be served, the jury needs evidence from more than just one source, and certainly from sources other than just the defendant. The third party discovery sought by KI is intimately related to the subject matter of this suit and the claims raised therein, and thus is properly discoverable. Moreover, if the witnesses cited by WSC took issue with the subpoenas one would think they would move for protective orders themselves. They did not; in fact, most of the subpoenaed plants have responded in one way or another. Indeed, the witnesses' routine handling of the subpoenas shows WSC's allegations of mass hysteria and confusion to be wildly overstated, to say the least. For all of these reasons, and the others set forth herein, WSC's Motion for Protective Order should be denied.

Respectfully submitted,

 /s/John M. G. Murphy
John M.G. Murphy
Federal Bar No.03811
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120
410-547-0699 (fax)

Attorneys for Plaintiff