IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RUSSIAN RESEARCH CENTER, <br> THE KURCHATOV INSTITUTE <br> <br>     Plaintiff, <br> <br>   vs. <br> <br> WESTERN SERVICES CORPORATION, <br>     *et al.* <br> <br>     Defendant, | Case No.: 02CV3878 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL THE DEFENDANTS TO PRODUCE ALL SOFTWARE AND OUTSTANDING DOCUMENTS IN THEIR CUSTODY AND CONTROL**

Plaintiff Russian Research Center, The Kurchatov Institute ("KI"), by its undersigned attorneys, pursuant to Federal Rule 37(a) and Local Rule 104, hereby files this Motion to Compel, requesting that the Court instruct the Defendants and Counter-Plaintiffs George Utmel ("Utmel") and Western Services Corporation's ("WSC") to produce computer code and other documents and items sought but not produced in discovery, and as grounds therefore, states as follows.

**BACKGROUND**

This case, in essence, is a copyright and trademark case. During the 1990s, The Kurchatov Institute ("KI") expended considerable time, money and effort developing software which

simulated the operation of nuclear and fossil fuel power plants, intended for use in personnel training and related matters. KI called this software AIS-95 for purposes of the European market, and later, SIMPORT for purposes of the North American market. In the late 1990s KI and Western Services Corporation ("WSC") engaged in negotiations for WSC's marketing of the SIMPORT software in the United States, but negotiations ultimately fell through. However, during these negotiations, WSC gained access to KI's software, and after negotiations failed, WSC misappropriated SIMPORT, licensing the software and using KI's mark without KI's authorization and without compensating KI. KI then sued under the Copyright Act, the Lanham Act, and various provisions of common law to end WSC's unauthorized licensing and sale of copies or derivatives of KI's software.

**THE EVIDENCE**

WSC does not deny that it has licensed and sold numerous copies of SIMPORT to power plants in the United States and elsewhere. Rather, it contends that the SIMPORT product it sold was created independently from KI's SIMPORT, and the latest versions are not in any way derivative of KI's work. Therefore, at some point, the jury or other finder of fact will be called upon to compare the works at issue in this case, and determine if WSC's product is sufficiently similar to, or derivative of, KI's work so as to infringe KI's copyright.

In order to do so, the jury will need to examine, among other things, KI's software and WSC's software. It may not be enough, however, for the jury to examine only the current version of WSC's product to compare it to KI's work given the nature of software development. As the Court likely knows, software is typically released over time in versions – witness, for example, WordPerfect 3.1, and its later iterations, WordPerfect 5, 6, 6.6, etc., among many others. Typically, later versions build on the first, with some components of the software being updated, while others remain the same. An examination of the original work and its modification through all versions typically will disclose the derivative nature of the work as some components are updated and others are retained over time. An examination of just the first and last versions, however, can be misleading, particularly if there has been any substantial time elapsed between the releases. Thus, if the jury is not to be misled, and if the Court wishes them to be best equipped to find the truth and justly resolve the instant claims, they should be permitted to examine all versions of the alleged infringing software to see if the progression of changes suggests illegal copying or formulation of a derivative work.

## THE REQUESTS

With these goals in mind, KI properly served WSC with document requests designed to elicit the various versions of the

allegedly infringing software, together with documentation and communication relating to its development. These requests were as follows:

    **REQUEST NO. 1:** The source code for each and every computer software program, or simulation package using computer software, that was marketed, sold or licensed at any time under the mark SIMPORT ...

    **REQUEST NO. 2:** The source code for every software program marketed, licensed, sold, or planned to be marketed, licensed or sold by you or on your behalf at any time since the calendar year 1995 that is or purports to be all or part of a simulation program or package for use by nuclear or fossil fuel power plants, regardless of the marks under which such program or programs was or is planned to be marketed, licensed, or sold, together with all prior versions of the software program and/or any of its components.

    **REQUEST NO. 3:** Every prior version of software on which any computer software program marketed, licensed or sold in whole or in part under the mark SIMPORT was based.

    **REQUEST NO. 4**: Every subroutine, engine, or other such component or constituent part of any software program marketed, licensed or sold in whole or in part under the mark SIMPORT, the source of which constituent part was another computer software program.

    **REQUEST NO. 5**: All memos, email, correspondence, notes, reports and other such documents generated or transmitted in the course of developing, creating or executing any computer software program marketed, license or sold in whole or in part under the mark SIMPORT.

    **REQUEST NO. 6:** All notes, flow charts, diagrams, directories, manuals, design documents, status reports, written instructions, workbooks, installation reports, output reports, release history and similar planning and testing materials used or generated in the course of developing, creating or executing any computer software marketed, licensed or sold in whole or in part under the mark SIMPORT.

    **REQUEST NO. 7:** All information received by you from any third party source used in any way in the development, creation

and execution of any computer software marketed, licensed or sold in whole or in part under the mark SIMPORT.

.........

**REQUEST NO. 10:** All documents that evidence any work done by any scientists associated with, or previously associated with, KI with respect to any computer software intended for marketing, licensing or sale in the United States, including the work product of its scientists, time records or other such records showing the work actually performed by said scientists, and the remuneration paid for the work performed by such scientists.

.........

**REQUEST NO. 13:** All documents that evidence, refer to, relate to, reflect or embody any information received from KI in the course of developing, creating or executing any computer software intended for marketing or licensing in the United States.

**REQUEST NO. 14**: All documents that evidence, refer to, relate to, reflect or embody the use made by you or by any other person of any information received from KI in the course of developing, creating or executing any software intended for marketing or licensing in the United States.

**REQUEST NO. 15:** All documents that evidence, refer to, relate to, reflect or embody the use made of any and all information received by any scientists associated with, or formerly associated with, KI in the course of developing, creating or executing any software intended for marketing or licensing in the United States.

.........

**REQUEST NO. 20:** All documents that evidence, refer to, relate to, reflect or embody the first use by any person or entity of the mark SIMPORT in the United States, including, but not limited to, the manner in which the mark was used, the manner by which the mark was disseminated to the public, the segment(s) of the public to which the mark was directed, and all documents that identify persons with personal knowledge of the first use of this mark.

.........

725989                                    5

**REQUEST NO. 26:**  All marketing materials, presentations, sales plans, and related correspondence and memoranda regarding attempts to sell or license any software program marketed in whole or in part under the mark SIMPORT and/or AIS-95.

.........

**REQUEST NO. 28:**  All correspondence and communications between you and KI with respect to any simulation computer software and/or related technology.

**REQUEST NO. 29:**  All correspondence and communications between you and SAIC and/or DS&S with respect to any simulation computer software and/or related technology.

**REQUEST NO. 30:**  All correspondence and communications between Western and Outmelidze with respect to any simulation computer software and/or related technology.

See WSC's Answers to KI's Requests for Production, (also setting forth the requests), attached as Exhibit A.

**WSC'S RESPONSE**

Despite the centrality of the requested software and related documents to the issues the jury ultimately must decide, WSC has vigorously resisted producing anything but what it contends is the only retained version of its earlier software product, entitled Simport 1997, and the "first and last version"[1]

---

[1]   While KI requested all versions and iterations of WSC's SIMPORT, and all programs on which they were based (KI Requests For Production Nos. 1 through 4), WSC offered only to produce the "first and last versions" SIMPORT 2000 and "source code for software marketed, sold or licensed under the SimPort name prior to 2000." Eventually, WSC modified this stance, producing even less – the first and last "data loads" of SIMPORT, and the only version it claims to have retained from prior to 2000, SIMPORT 1997.
    The "data load" produced by WSC, which it claims meets its agreement to produce the "first version" of SIMPORT, is actually an end-product of SIMPORT as it appeared after development, and as it

725989                                  6

of its most current version, SIMPORT 2000 – a selective, partial production which gives rise to the danger of misleading the jury as explained above.[2]  WSC has also attempted to prevent KI from obtaining copies of the software it sold from other sources, by way of its pending Motion for Protective Order, among other things.  All of this, of course, suggests that whatever is contained in the versions (or documents) WSC tries so hard to suppress is not good for it.  But most importantly, the suppression of this evidence will handicap the jury by forcing it to decide this case based on only a few pieces of the puzzle.

WSC's failure to produce all versions and previous iterations of the software substantially hampers KI's ability to prove the extent of WSC's infringement.  WSC's counsel is wrong when she states that the only necessary comparison involves WSC's final SIMPORT product and not the intermediate versions. WSC has defended this action on the basis that it developed its version of SIMPORT with no reliance on KI's SIMPORT.  As such, KI should be afforded discovery of these early versions to test the veracity of WSC's defense.  Additionally, recent federal

---

existed immediately prior to modification for use at the "SeaBrook" power plant.  See Letter from Margaret A. Keeley of July 10, 2003, attached as Exhibit B.  Counsel for WSC herself stated that the two versions produced are almost identical.  Obviously, analysis of these allegedly duplicate end products is insufficient to trace WSC's SIMPORT's development.  Likewise, it will not provide the finder of fact with sufficient evidence to justly resolve KI's claims.

[2]   See Letters to Margaret Keeley, Esq., dated July 18, 2003 and July 30, 2003, attached as Exhibits C and D, respectively.

725989                                 7

case law instructs that copying evidenced in intermediate versions of software such as that withheld by WSC is also actionable under the Copyright Act.

> The fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement.

See Sega Enter. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1518 (9th 1992)(quotations omitted); DSC Comm. Corp. v. DGI Tech., Inc., 898 F. Supp. 1183, 1188 (N.D. Tex. 1995).

It is appropriate for this Court and/or the jury to hear evidence regarding any initial and intermediate copying by WSC of KI's software not only in light of defendants' assertion that the software was developed independent of KI's SIMPORT, but also because such copying itself violates KI's rights under the Copyright Act.  See Sega at 1519.  In DSC Comm. Corp., supra, the Texas district court, following Sega, held that the "Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the copy represents."  Id. at 1188 (citing Sega, supra).  There, the court held that actionable copying can be proven as to any incremental version of software.  Id.

There would seem to be no good reason for WSC to refuse to produce this critical software and these key documents.  The

725989                                 8

Court and the jury need to examine the development over time of the software to judge the merits of the infringement claims. The planning materials and communications[3] will allow the Court and the jury to place in context the development of the software as shown by the successive versions, and perhaps will itself shed light both on KI's claims and WSC's defenses. Documentation of the monies received by WSC for the sale or licensing of the infringing software is directly relevant to KI's damages claims, of course, and there would seem to be less than no reason for WSC to await a Motion to Compel to disgorge documentation evidencing the "time and materials fee" WSC raises in its own Answer.  Finally, KI is manifestly entitled to the production of all documents evidencing WSC's first use in commerce of the SIMPORT mark if WSC intends in any way to contest KI's trademark claims, and correspondence between WSC and the United States Patent and Trademark office is also clearly relevant.

---

[3]   As to the requested communications, as late as July 3, 2003, Ms Keeley stated that WSC "would" produce all communications except the email. See letter from Ms. Keeley, July 3, 2003, attached as Exhibit E.  After July 3, however, WSC produced no communications. Nonetheless, in a telephone call with KI's counsel, on or about July 31, 2003, Ms. Keeley stated that WSC had produced all communications except email.  See Certification of Good Faith, attached as Exhibit F, ¶13(d).  To date, WSC has produced only a handful of letters between it and SAIC/DS&S, no letters or other communications between it and the various power plant customers and less than 15 of the estimated 8,000 emails claimed to exist by WSC.

The discoverability of all this documentation withheld by WSC seems clear beyond question. Undersigned counsel does not lightly note that WSC's withholding of this documentation (and software) until service of a motion to compel seems to evidence a fundamental disregard of Fed. R. Civ. P. 1 – noting that the Rules "shall be construed <u>and</u> <u>administered</u> to secure the just, speedy, <u>and</u> <u>inexpensive</u> determination of every action."  <u>Id.</u> (emphasis supplied).

## CONCLUSION

Almost forty years ago, Judge Wright of the United States Court of Appeals for the District of Columbia Circuit, buoyed with optimism, stated:

> Liberal provision for discovery has made the search for truth [in civil cases] a realistic enterprise rather than an obstacle course festooned with devices for denying evidence to the unwary and unadvised.

<u>Levin v. Clark</u>, 408 F.2d 1209, 1227 (C.A.D.C. 1967). As with many reforms borne of lofty goals, however, the "search for truth," shining in its creation, has become tarnished by the fallibility of those charged with its administration. While not common in this District in the undersigned's experience, certain cases seem to lend themselves to extreme, unjustified and unilateral interpretations of what is relevant and discoverable

for discovery purposes, rendering civil discovery more of an advocatory forum than an aid to disclosure of the truth.

This is such an instance. Only an extreme intellectual exercise can produce an argument why documents alleged to constitute or evidence infringing materials are not properly discoverable; yet that is the defendant's position. In simplest terms, the documents KI seeks support the very heart of its case.

To credit WSC's withholding of these documents is to suppress the truth. The Court should not allow this to happen. Therefore, KI respectfully requests that this Court order the production of all documents responsive to its requests set forth above.

                                          Respectfully submitted,

                                      _____/s/_____
John M.G. Murphy
Federal Bar No. 03811
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120
410-547-0699 (fax)

Attorneys for Plaintiff