## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RUSSIAN RESEARCH CENTER THE KURCHATOV INSTITUTE,** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**WESTERN SERVICES CORP., et al.,** )<br><br>**Defendants, Counterclaimant, and Third Party Plaintiff,** )<br><br>**v.** )<br><br>**GSE SYSTEMS, INC.** )<br><br>**Third Party Defendant.** ) | **Case No.: AMD 02-3878** |

## FIRST AMENDED ANSWER, DEFENSES,
## COUNTERCLAIM AND THIRD PARTY CLAIM OF
## <u>WESTERN SERVICES CORPORATION AND GEORGE UTMEL</u>

Defendant and Counterclaimant, Western Services Corporation ("WSC") hereby submits this Amended Answer, Defenses, Counterclaim and Third Party Claim against the Russian Research Center the Kurchatov Institute ("KI") and GSE Systems, Inc. ("GSE"). The purpose of the amendment is to conform WSC's defenses and claims to the evidence adduced thus far in discovery: adding several new defenses, and adding a claim under 15 U.S.C. § 1125(d) for violation of WSC's "SimPort" mark through GSE's

registration of two domain names: "SIMPORT.US" AND "SIMPORT.BIZ." WSC also demands a trial by jury for all issues so triable.

## AMENDED ANSWER AND DEFENSES TO KI'S SECOND AMENDED COMPLAINT

In response to each of the numbered paragraphs of the KI Second Amended Complaint, WSC and Mr. Utmel state as follows:

## FIRST DEFENSE

1.    The allegations of Paragraph 1 of the Second Amended Complaint merely describe the reasons for amending the Complaint and do not require a response, except that WSC and Mr. Utmel deny that they are liable for any copyright infringement.

2.    WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations contained in Paragraph 2 of the Second Amended Complaint, although they believe them to be true.

3.    WSC and Mr. Utmel admit the allegations contained in Paragraph 3 of the Second Amended Complaint.

4.    WSC and Mr. Utmel admit the allegations contained in Paragraph 4 of the Second Amended Complaint.

5.    Paragraph 5 of the Second Amended Complaint states a legal conclusion to which no response is required.

6.    Paragraph 6 of the Second Amended Complaint states a legal conclusion to which no response is required.

7.     WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations contained in Paragraph 7 of the Second Amended Complaint.

8.     WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations contained in Paragraph 8 of the Second Amended Complaint, although WSC and Mr. Utmel deny that KI ever provided WSC or Mr. Utmel with successfully developed simulation software that would embrace a full range of tasks on mimic and training systems.

9.     WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations contained in Paragraph 9 of the Second Amended Complaint, although WSC and Mr. Utmel deny that KI ever provided WSC or Mr. Utmel with simulation software tools that could be used to build a customized simulation software package for nuclear and fossil fuel power plants.

10.     WSC and Mr. Utmel admit that by 1996 KI was preparing to promote and present to the worldwide market a product it named "AIS-95," and that toward that end KI had prepared a demonstration of what it claimed AIS-95 could do.  WSC and Mr. Utmel are without sufficient knowledge to admit or deny the remaining allegations of Paragraph 10 of the Second Amended Complaint, although they deny that they were ever shown or provided a version of AIS-95 that was capable of building a customized simulation software package for nuclear and fossil fuel power plants.

11.    WSC and Mr. Utmel admit that in 1997 WSC agreed to pay for software engineers affiliated with KI to come to the United States and work on the building of simulation models for power plants which had contracted with SAIC for such models. WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the remaining allegations contained in Paragraph 11 of the Second Amended Complaint.

12.    WSC and Mr. Utmel admit that during 1997 WSC was serving as a subcontractor to SAIC with regard to simulation software.  WSC and Mr. Utmel further admit that WSC was cooperating with KI to develop simulation interfaces for the United States market, and admit that WSC agreed to and did pay KI to provide engineers, who were visiting from Russia, to work under WSC's direction and control in connection with the work to be performed under WSC's subcontract with SAIC.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 12 of the Second Amended Complaint.

13.    WSC and Mr. Utmel deny the allegations contained in Paragraph 13 of the Second Amended Complaint.

14.    WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny whether KI has made any modifications to any simulation technology since 1997. WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 14 of the Second Amended Complaint.  KI did not create the SimPort name, and has never had any proprietary rights in the SimPort name.

15.     WSC and Mr. Utmel admit that WSC paid a time and materials fee for KI to provide engineers, who were visiting from Russia, to work with WSC, under the direction and control of WSC, on the work WSC was to perform under the subcontract with SAIC. WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 15 of the Second Amended Complaint.

16.     WSC and Mr. Utmel deny the allegations contained in Paragraph 16 of the Second Amended Complaint.  KI never had any proprietary rights in the SimPort name, and therefore, WSC, SAIC and DS&S did not need permission from KI to use the SimPort name.

17.     WSC and Mr. Utmel admit that WSC paid a time and materials fee for KI to provide project engineers and software specialists to work with WSC, under the direction and control of WSC, in developing simulation software and in building simulation models for a variety of projects.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 17 of the Second Amended Complaint.

18.     WSC and Mr. Utmel deny the allegations contained in Paragraph 18 of the Second Amended Complaint.

19.     WSC and Mr. Utmel admit that WSC has hired approximately five employees who previously worked for KI.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 19 of the Second Amended Complaint.

20.    WSC and Mr. Utmel deny the allegations contained in Paragraph 20 of the Second Amended Complaint.

21.    WSC and Mr. Utmel deny the allegations contained in Paragraph 21 of the Second Amended Complaint.

22.    After KI breached the initial agreement reached between WSC and KI, the only agreement reached by the parties was that WSC would pay KI for the services rendered to WSC by KI-affiliated engineers; such services constituted WSC's work for hire. WSC did so, and therefore no agreement was ever memorialized in writing. WSC and Mr. Utmel deny that KI was entitled to any information about the projects in which the SimPort software was used. WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 22 of the Second Amended Complaint.

23.    WSC and Mr. Utmel deny the allegations contained in Paragraph 23 of the Second Amended Complaint.

24.    WSC and Mr. Utmel deny the allegations contained in Paragraph 24 of the Second Amended Complaint.

25.    WSC and Mr. Utmel admit that WSC was paid by SAIC or DS&S for the work performed pursuant to WSC's subcontracts with SAIC and DS&S on the power plant projects listed in Paragraph 24 of the Second Amended Complaint. WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 25 of the Second Amended Complaint.

26.    WSC and Mr. Utmel admit that WSC began writing code for new simulation software in late 1999, and that WSC uses the name "SimPort" to identify this software. WSC and Mr. Utmel deny that the SimPort name ever belonged to KI.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 26 of the Second Amended Complaint.

27.    WSC and Mr. Utmel admit that WSC has hired approximately five employees who previously worked for KI.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 27 of the Second Amended Complaint.

28.    WSC and Mr. Utmel admit that WSC is marketing and licensing a program called SimPort.  WSC and Mr. Utmel deny that the program is derived from one created by KI, or that KI has any intellectual property rights to SimPort.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 28 of the Second Amended Complaint.

29.    WSC and Mr. Utmel admit that WSC received a letter from KI on or about May 28, 2002.  That letter speaks for itself as to its content.  WSC and Mr. Utmel deny that KI has any rights to the SimPort program, and therefore deny that anyone is utilizing the SimPort program in violation of KI's rights.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 29 of the Second Amended Complaint.

30.    WSC and Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations contained in Paragraph 30 of the Second Amended Complaint.

Count I of KI's Second Amended Complaint
(Common Law Unfair Competition)

31.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 30 of the Second Amended Complaint.

32.    WSC and Mr. Utmel deny the allegations contained in Paragraph 32 of the Second Amended Complaint.

33.    WSC and Mr. Utmel deny the allegations contained in Paragraph 33 of the Second Amended Complaint.

34.    WSC and Mr. Utmel deny the allegations contained in Paragraph 34 of the Second Amended Complaint.

35.    WSC and Mr. Utmel deny the allegations contained in Paragraph 35 of the Second Amended Complaint.

36.    WSC and Mr. Utmel deny the allegations contained in Paragraph 36 of the Second Amended Complaint.

Count II of KI's Second Amended Complaint
(Tortious Interference With Business Relations)

37.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 36 of the Second Amended Complaint.

38.    WSC and Mr. Utmel deny the allegations contained in Paragraph 38 of the Second Amended Complaint.

39.     WSC and Mr. Utmel deny the allegations contained in Paragraph 39 of the Second Amended Complaint.

40.     WSC and Mr. Utmel deny the allegations contained in Paragraph 40 of the Second Amended Complaint.

41.     WSC and Mr. Utmel deny the allegations contained in Paragraph 41 of the Second Amended Complaint.

42.     WSC and Mr. Utmel deny the allegations contained in Paragraph 42 of the Second Amended Complaint.

43.     WSC and Mr. Utmel deny the allegations contained in Paragraph 43 of the Second Amended Complaint.

44.     WSC and Mr. Utmel deny the allegations contained in Paragraph 44 of the Second Amended Complaint.

45.     WSC and Mr. Utmel deny the allegations contained in Paragraph 45 of the Second Amended Complaint.

46.     WSC and Mr. Utmel deny the allegations contained in Paragraph 46 of the Second Amended Complaint.

Count III of KI's Second Amended Complaint
(Unjust Enrichment)

47.     WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 46 of the Second Amended Complaint.

48.     WSC and Mr. Utmel deny the allegations contained in Paragraph 48 of the Second Amended Complaint.

49.     WSC and Mr. Utmel deny the allegations contained in Paragraph 49 of the Second Amended Complaint.

50.     WSC and Mr. Utmel deny the allegations contained in Paragraph 50 of the Second Amended Complaint.

51.     WSC and Mr. Utmel deny the allegations contained in Paragraph 51 of the Second Amended Complaint.

52.     WSC and Mr. Utmel deny the allegations contained in Paragraph 52 of the Second Amended Complaint.

Count IV of KI's Second Amended Complaint
(Breach of Contract)

53.     WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 52 of the Second Amended Complaint.

54.     WSC and Mr. Utmel admit that KI was to provide WSC simulation software in or about 1997, and that WSC agreed to pay for software engineers affiliated with KI to come to the United States and use that software for the customization of power plant simulation models which WSC had contracted with SAIC to provide.  KI breached this agreement by failing to provide the simulation software it falsely claimed to have

10

developed.  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 54 of the Second Amended Complaint.

55.    WSC and Mr. Utmel deny the allegations contained in Paragraph 55 of the Second Amended Complaint.

56.    WSC and Mr. Utmel deny the allegations contained in Paragraph 56 of the Second Amended Complaint.

Count V of KI's Second Amended Complaint<br>(Copyright Infringement)

57.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 56 of the Second Amended Complaint.

58.    WSC And Mr. Utmel are without sufficient knowledge at this time to admit or deny the allegations concerning what KI terms "SimPort 2002."  WSC and Mr. Utmel deny the remaining allegations contained in Paragraph 58 of the Second Amended Complaint.

59.    WSC and Mr. Utmel deny the allegations contained in Paragraph 59 of the Second Amended Complaint.

60.    WSC and Mr. Utmel deny the allegations contained in Paragraph 60 of the Second Amended Complaint.

## Count VI of KI's Second Amended Complaint
(Copyright Infringement)

61.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 60 of the Second Amended Complaint.

62.    WSC and Mr. Utmel deny the allegations contained in Paragraph 62 of the Second Amended Complaint.

63.    WSC and Mr. Utmel deny the allegations contained in Paragraph 63 of the Second Amended Complaint.

64.    WSC and Mr. Utmel deny the allegations contained in Paragraph 64 of the Second Amended Complaint.

## Count VII of KI's Second Amended Complaint
(Copyright Infringement)

65.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 64 of the Second Amended Complaint.

66.    WSC and Mr. Utmel deny the allegations contained in Paragraph 66 of the Second Amended Complaint.

67.    WSC and Mr. Utmel deny the allegations contained in Paragraph 67 of the Second Amended Complaint.

68.    WSC and Mr. Utmel deny the allegations contained in Paragraph 68 of the Second Amended Complaint.

Count VIII of KI's Second Amended Complaint
(Copyright Infringement)

69.     WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 68 of the Second Amended Complaint.

70.     WSC and Mr. Utmel deny the allegations contained in Paragraph 70 of the Second Amended Complaint.

71.     WSC and Mr. Utmel deny the allegations contained in Paragraph 71 of the Second Amended Complaint.

72.     WSC and Mr. Utmel deny the allegations contained in Paragraph 72 of the Second Amended Complaint.

Count IX of KI's Second Amended Complaint
(Copyright Infringement)

73.     WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 72 of the Second Amended Complaint.

74.     WSC and Mr. Utmel deny the allegations contained in Paragraph 74 of the Second Amended Complaint.

75.     WSC and Mr. Utmel deny the allegations contained in Paragraph 75 of the Second Amended Complaint.

76.     WSC and Mr. Utmel deny the allegations contained in Paragraph 76 of the Second Amended Complaint.

Count X of KI's Second Amended Complaint
(Copyright Infringement)

77.    WSC and Mr. Utmel incorporate herein their responses to Paragraphs 1 through 76 of the Second Amended Complaint.

78.    WSC and Mr. Utmel deny the allegations contained in Paragraph 78 of the Second Amended Complaint.

79.    WSC and Mr. Utmel deny the allegations contained in Paragraph 79 of the Second Amended Complaint.

80.    WSC and Mr. Utmel deny the allegations contained in Paragraph 80 of the Second Amended Complaint.

Except as expressly admitted herein, WSC and Mr. Utmel deny the allegations of the Second Amended Complaint.

**SECOND DEFENSE**

The Second Amended Complaint fails to state a claim upon which relief can be granted.

**THIRD DEFENSE**

Plaintiff's claims are barred by the statute of limitations.

**FOURTH DEFENSE**

Plaintiff's claims are barred by the doctrine of laches and/or waiver.

## FIFTH DEFENSE

Plaintiff's claims are barred by the doctrine of equitable estoppel.

## SIXTH DEFENSE

Plaintiff's claims are barred by a lack of authority to contract.

## SEVENTH DEFENSE

Plaintiff's unjust enrichment and unfair competition claims are pre-empted by federal copyright law.

## EIGHTH DEFENSE

Plaintiff's claims fail due to a lack of standing.

## NINTH DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

## TENTH DEFENSE

Plaintiff's claims are barred in whole or in part by the failure to mitigate damages.

## ELEVENTH DEFENSE

Plaintiff's contract claim is barred by the doctrine of novation and release.

## TWELFTH DEFENSE

Plaintiff's claims are barred by payment and release.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred by illegality.

## FOURTEENTH DEFENSE

Plaintiff's copyright claims are barred by the existence of an implied, non-exclusive license.

## FIFTEENTH DEFENSE

Plaintiff's copyright claims are barred due to copyright misuse.

## SIXTEENTH DEFENSE

Plaintiff's copyright claims are barred due to fraud on the copyright office.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred because SimPort 2000 is not substantially similar to any software in which Plaintiff has either an ownership or copyright interest.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred by the doctrine of Scenes A Faire.

## NINETEENTH DEFENSE

Plaintiff's claims are barred because any features of SimPort 2000 that may be similar to any technology used by KI are in the public domain.

## TWENTIETH DEFENSE

Plaintiff's claims are barred because any features of SimPort 2000 that may be similar to technology in which KI has an ownership or copyright interest are de minimis.

## TWENTY-FIRST DEFENSE

Plaintiff's claims are barred because any features of SimPort 1997 or SimPort 2000 that may be similar to technology in which KI has an ownership or copyright interest is the result of WSC's obligation to mitigate the damages arising from KI's breach of contract in failing to deliver simulation software capable of building a power plant simulator.

## TWENTY-SECOND DEFENSE

Plaintiff's claims are barred by the merger doctrine.

## AMENDED COUNTERCLAIM AND THIRD PARTY CLAIM

### Nature of the Counterclaims and Third Party Claims

1.      Counterclaimant and third party plaintiff Western Services Corporation ("WSC") owns the "SimPort" mark, and the simulation software now bearing the SimPort name. This software was developed independently of the plaintiff, Russian Research Center The Kurchatov Institute ("KI"), and without assistance from KI.

2.      WSC, in conjunction with SAIC, first began marketing simulation software under the SimPort name in or about 1996.

3.      WSC developed new simulation software in 2000, and immediately began marketing the software under the SimPort name (hereinafter, "SimPort 2000"). WSC

markets the software in conjunction with Data Systems & Solutions ("DS&S"), which retains WSC as a subcontractor on simulator projects for various power plants.

4.    WSC had initially explored a joint venture with KI for the development of the 2000 simulation software.  WSC and KI could not come to agreement on the terms of such a venture, however, so WSC developed the SimPort 2000 software without any contribution from KI.

5.    In or about August 2002, KI claimed that it was in fact the owner of the SimPort technology, and that it was granting an exclusive license to third party defendant GSE Systems, Inc. ("GSE") to market and distribute the SimPort software in the United States.

6.    GSE has begun marketing simulation software under the "SimPort" name pursuant to this purported license.  It is unclear if GSE intends actually to sell a product under the "SimPort" name, however, or if GSE simply hopes to sell its own version of simulation software to customers diverted from WSC as a result of the confusion being created in the marketplace by GSE's false claim that WSC does not own the software it is selling.

7.    GSE has also now registered for two different internet domain names that incorporate the name SimPort:  "SIMPORT.BIZ" and "SIMPORT.US"

8.    WSC has never permitted either KI or GSE to use its SimPort software, and upon information and belief, neither KI nor GSE possess WSC's SimPort 2000 technology.

9.    Nor has WSC granted KI or GSE the right to use the SimPort name.

10.     GSE's and KI's use of the SimPort name, and KI's false representation that it developed, and now possesses, the SimPort technology, have created confusion in the marketplace.  This confusion, in turn, has led to the loss of new contracts for WSC, and has jeopardized several of WSC's existing contracts.

11.     Neither GSE nor KI have any legal rights in the SimPort name, nor do they have any legal or proprietary rights in WSC's SimPort software.

12.     Wherefore, WSC seeks to enjoin GSE and KI from using the SimPort name, to enjoin GSE and KI from making any further representations that they have any interest in WSC's SimPort software, and to collect damages from GSE and KI for the losses suffered by WSC as a result of their improper actions.

**Parties**

13.     Plaintiff KI has its principal place of business in Moscow, Russia.  It has no place of business in the United States.

14.     Defendant George Utmel is a citizen and resident of Virginia.

15.     Defendant, counterclaimant and third party plaintiff WSC is a Maryland corporation with its principal place of business at 5705 Industry Lane, Frederick, Maryland.

16.     GSE Systems, Inc. ("GSE"), is a Delaware corporation with its principal place of business at: 9189 Red Branch Road, Columbia, Maryland, 21045.

19

**Jurisdiction**

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

1332 and 1367.

18.    This Court has personal jurisdiction over GSE pursuant to the laws of

Maryland and the United States Constitution, including but not limited to Md. Code Ann.,

Cts. & Jud. Proc. § 6-102.

19.     Venue is proper pursuant to 28 U.S.C. § 1391.

**The Contractual Relationship Between WSC and KI**

20.    WSC was founded in 1995 by George Utmel.  Mr. Utmel was born in the

Soviet Union.  In the Soviet Union, he was trained in software simulation technology for

nuclear power plants.  Mr. Utmel subsequently emigrated to the United States, and

became a United States citizen.

21.    Nuclear and traditional fossil-fuel power plants train their operators with

simulation models that replicate the power plant's equipment and operations.

22.    In approximately 1996, KI alleged to WSC that it had software that provided

all the tools necessary to build a simulation model that was customized to a particular

power plant, and was looking to market this software in the United States.  KI called its

software the "AIS technology."

23.    Based upon these representations by KI, WSC agreed to market simulation

models in conjunction with KI, and introduced KI to SAIC for that purpose.  SAIC was a

well known name in the United States power industry, and had many contacts in the marketplace that could be used to promote simulation software.

24.    Based upon these representations by KI, WSC signed a sub-contract with SAIC to provide a simulation model for the Sherco power plant.  WSC then agreed to pay KI for several KI engineers to travel and stay in the United States and work on customizing the Sherco simulation model with the software KI claimed to have developed.

25.    When the KI engineers arrived in the United States, WSC discovered that KI's AIS technology in fact did not contain the tools required to develop a power plant simulation model.

26.    When WSC informed KI of its breach – that the AIS technology did not contain the tools necessary to customize a simulation model – KI told WSC that KI would not fund the required software development, and that WSC was responsible for all programming and development work.

27.    WSC had no choice but to assume the burden of developing the software that KI had promised to deliver as WSC had already contracted to provide SAIC with a simulation model for the Sherco power plant, and WSC was already behind in delivering on the contract due to KI's breach.

28.    WSC thereafter consummated a new relationship with KI.  WSC paid a time and materials fee for KI to provide engineering labor for the software development, and paid KI over one million dollars ($1,000,000) for these engineers' time and related expenses.

29.    The KI engineers worked at WSC's offices in the United States, under WSC's direction and control, to develop software tools that could be used to build the Sherco simulation model; KI did not retain any proprietary or other ownership rights in the software developed.

30.    WSC named the software "SimPort," and it will be referred to herein as "SimPort 1997."

31.    WSC subsequently paid KI to provide engineering labor for the development and implementation of simulation models for two other power plants between 1997 and 1998: the Armstrong power plant, and the Arnot power plant in South Africa.

32.    Once again, KI merely provided engineering labor to the project for a fee based on time and materials, and retained no proprietary interest in the simulation models developed, or the SimPort 1997 software used to build the models.

**The Simulation Data Loads**

33.    These early endeavors of WSC resulted in two products: the SimPort 1997 software tools that could be used to build a simulation data load (or simulator) customized to a particular power plant, and actual simulation data loads for three power plants: Sherco, Armstrong, and Arnot.

34.    The Sherco, Armstrong and Arnot simulation data loads contain portions of the SimPort 1997 computer programming code developed by WSC, as well as the plants'

proprietary data.  The code portions remain a proprietary and confidential trade secret of WSC.

35.    When the engineers returned to KI in Russia, WSC provided them both the data loads for Sherco, Armstrong and Arnot, and a substantial portion of the source code for SimPort 1997 itself, so that those engineers could assist WSC and SAIC with any warranty work that might arise during the one year warranty period that followed the implementation of the simulation model at each power plant.

36.    On or about September 30, 2002, WSC learned that KI had used these simulation data loads in presentations to a United States company, GSE Systems, Inc.

37.    By letter dated January 8, 2003, WSC requested that KI return all copies of the simulation data loads that it possessed or had distributed, noting that the engineers' assistance in providing warranty services was long concluded.

38.    To date, KI has refused to return the simulation data loads.

**The Development of WSC's Current SimPort 2000 Software**

39.    SimPort 1997 was created under less than ideal conditions because of the time pressure of the over-due Sherco contract.  WSC desired to start over with the creation of new, improved simulation software that could be developed without such time pressures.  To that end, WSC explored the possibility of KI providing the engineering labor for the software development in return for a proprietary interest in the resulting product.

40.    Under the project being contemplated by the parties, KI would contribute significant savings to the project by providing engineering labor at rates substantially lower than that available in the United States.  WSC, in turn, would manage the project, and provide the majority of the financing.

41.    WSC and KI could not reach an agreement on the terms of such a venture, however, and thus WSC determined to go forward with the software development project on its own.

42.    In the meantime, several of the KI engineers who had previously worked with WSC in the United States approached Mr. Utmel concerning the possibility of becoming formal, full-time employees of WSC.

43.    WSC hired approximately five of these former KI engineers to assist with the development of its new simulation software, hereinafter referred to as "SimPort 2000" to distinguish it from WSC's earlier simulation software.  WSC incurred substantial, additional cost in employing these engineers directly, rather than sub-contracting for their labor through KI.

44.    Moreover, KI bore none of the risk of the project as KI had no interest in it whatsoever.

45.    WSC began designing its new simulation software in approximately November 1999, and gave the new software the SimPort name when development was completed in 2000.

24

46.    WSC has marketed SimPort 2000 in conjunction with DS&S – a joint venture of SAIC and Rolls Royce – and the software has been used to build simulation models for numerous power plants throughout the world.  For each of these projects, DS&S contracts directly with the power plants, and WSC then subcontracts with DS&S.

47.    KI did not provide labor (or any other resource) for the development of the SimPort 2000 software; indeed, KI had no involvement whatsoever in the development, sale or implementation of the SimPort 2000 software.

48.    WSC has never granted permission for KI to possess or use the SimPort 2000 software, and upon information and belief KI does not in fact have the SimPort 2000 technology.

**The Current Lawsuit**

49.    In August of 2002, GSE issued a press statement claiming that pursuant to a contract with KI, GSE had been granted "the exclusive rights to use and sublicense SimPort in the United States, and the primary right to use and sublicense SimPort worldwide."  GSE described SimPort as "a robust, Microsoft Windows ®-based, real-time simulation environment used primarily for power plant simulators."

50.    GSE subsequently informed several existing and potential customers of DS&S (who are indirectly customers of WSC due to the subcontracts between DS&S and WSC) that KI had sued WSC over "SimPort," and that KI was asking any customers who had received "SimPort" from WSC and DS&S to stop using it and destroy all copies.

25

51.    Upon information and belief, KI and GSE had previously agreed that GSE would make these representations, and knew that the customers had existing or impending business relationships with DS&S directly, and with WSC indirectly through DS&S.

52.    Indeed, in order to lend legitimacy to GSE's claims that KI had developed "SimPort," and licensed it exclusively to GSE, KI provided statements to GSE for inclusion in the August 2002 press release.

53.    KI and GSE knew that these representations were false; KI and GSE knew that the "SimPort" name was the proprietary property of WSC; KI and GSE also knew that the simulation software utilized by WSC was the property of WSC, and that KI had no proprietary interest in it.

54.    In January 2003, both GSE and KI attended an industry conference for customers in Orlando, Florida.  KI was not scheduled to make a presentation at the conference, but GSE introduced KI during its own presentation, and provided a platform for KI to make a presentation on "SimPort."

55.    KI used WSC's "SimPort" logo during its presentation, as did GSE in brochures it made available to customers at the conference.

56.    Further, KI showed slides taken from the Arnot simulator that bore DS&S's logo, and claimed that it was KI's technology that had built the simulator.

26

57.    KI admitted at the conference, however, that it did not know if KI's "SimPort" technology was the same as that being marketed by WSC and DS&S as KI did not know the details of the technology being sold by WSC and DS&S.

58.    Moreover, GSE admitted during the conference that despite its press release announcing that it was the sole licensee of KI's SimPort in the United States, it had no intent to sell any products under the SimPort name here.

59.    These presentations by KI and GSE were made in spite of GSE's previous assurances – in writing – that GSE had no intention of publicizing or displaying any information derived from the Sherco, Armstrong or Arnot projects at the Orlando conference.

60.    GSE's and KI's use of the "SimPort" name in their licensing agreements and public statements has created confusion in the marketplace concerning the ownership of the SimPort 2000 technology being used by WSC and DS&S to build simulators.

61.    Upon information and belief, WSC has lost several contractual opportunities as a result of KI's and GSE's improper and intentional interference, and creation of confusion.

62.    As a result of KI's and GSE's tortious conduct, WSC is also at risk of losing several existing contracts, each of which were known to KI and GSE.

63.    As of February 2003, GSE has also registered two internet domain names using the SimPort name:  "SIMPORT.BIZ" and "SIMPORT.US."

64.    These domain names are identical or confusingly similar to WSC's SimPort mark, and will created confusion in the marketplace.

65.    GSE's registered these domain names in bad faith.  GSE has no rights or legitimate interests in the domain names.

### COUNT I
### (Unfair Competition Pursuant to 15 U.S.C. § 1125(a) Against KI and GSE)

66.    WSC incorporates herein the allegations of Paragraph 1 through 65.

67.    WSC developed the SimPort technology and is the owner of the "SimPort" mark.  WSC's SimPort mark is distinctive.

68.    In August 2002, KI purported to license simulation software, bearing the name SimPort, to GSE.  GSE has made public statements that it has the exclusive right to use and sublicense SimPort in the United States, and the primary right to use and sublicense SimPort worldwide.

69.    WSC has not authorized KI or GSE to utilize the name SimPort in conjunction with simulation software technology.

70.    KI's and GSE's unauthorized use of the SimPort trademark in commerce is likely to cause confusion in the marketplace as to the connection, origin or sponsorship of the SimPort technology and SimPort name.

71.    Such actions are intended either to secure to KI and GSE the benefits arising from WSC's labor, reputation and good will in connection with WSC's SimPort software program, or to divert customers of the SimPort technology to GSE's own simulation software technology.

72.     KI and GSE are violating WSC's right in its trademark with the purpose and intent of causing confusion and usurping WSC's potential business opportunities.  These actions constitute unfair competition and trademark infringement in violation of 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73.     As a direct, proximate, and foreseeable result of KI's and GSE's unauthorized use of the SimPort name, WSC has sustained, and continues to sustain, irreparable injury.

**COUNT II**
**(Common Law Unfair Competition Against KI and GSE)**

74.     WSC incorporates herein the allegations of Paragraph 1 through 73.

75.     WSC is the owner of the "SimPort" mark.

76.     WSC first developed simulation technology in 1997 (SimPort 1997), and is the owner of the SimPort 1997 simulation software technology.

77.     WSC developed new simulation software in 2000 and immediately began marketing the software under WSC's SimPort mark.

78.     The only simulation software program currently marketed by WSC under the SimPort name is the "SimPort 2000" software program.

79.     Upon information and belief, neither KI nor GSE possesses the "SimPort 2000" software program.

80.     In August 2002, KI purported to license "SimPort" simulation software developed by WSC to GSE, and GSE has made public statements that it has the exclusive right to use and sublicense SimPort in the United States, and the primary right to use and sublicense SimPort worldwide.

81.     KI's and GSE's use of the SimPort technology, or derivatives thereof, and/or use of the SimPort name has deceived and will continue to deceive the public regarding the source of the SimPort program marketed by WSC and DS&S.

82.     Upon information and belief, KI's and GSE's actions are intended either to secure to KI and GSE the benefits arising from WSC's labor, reputation and good will in connection with the SimPort software program by passing off their technology as the SimPort marketed by WSC and DS&S, or to divert customers of the SimPort technology to GSE's own simulation software technology.

83.     KI and GSE have further engaged in unfair competition, and created confusion in the marketplace and among existing DS&S customers, by representing to third parties that copies of the SimPort programs delivered by DS&S and WSC should be destroyed.

84.     As a direct, proximate, and foreseeable result of KI's and GSE's unauthorized use of the SimPort name, WSC has sustained, and continues to sustain, irreparable injury.

## COUNT III
### (Tortious Interference Against KI and GSE)

85.     WSC incorporates herein the allegations of Paragraph 1 through 84.

86.     WSC maintains subcontracts with DS&S under which the entities provide simulation models, built with SimPort, to power plants.

87.     DS&S has many potential customers who are considering, or have recently considered, purchasing simulation models built with SimPort software.

88.    WSC would be the subcontractor on any contract between DS&S and these customers.

89.    GSE and KI knew of these existing and potential business relationships of WSC.

90.    GSE is intentionally interfering with those business relationships by utilizing the SimPort name in marketing statements.

91.    GSE is intentionally interfering with those business relationships by disseminating false statements in the marketplace concerning the "SimPort" name and the technology it represents.

92.    KI, aided and abetted by GSE, intentionally interfered with those business relationships by falsely representing that it was KI technology that developed the Arnot data load KI displayed at the conference in Orlando, Florida in January 2003.

93.    KI is intentionally interfering with those business relationships by falsely representing that it owns the SimPort technology.

94.    KI is also aiding and abetting GSE in its intentional interference, by, *inter alia*, purporting to have licensed "SimPort" to GSE, and providing GSE with statements to include in GSE's communications with the marketplace.

95.    As a direct, proximate, and foreseeable result of KI's and GSE's intentional interference, WSC has sustained, and continues to sustain damage.

## COUNT IV
## (Misappropriation Against KI)

96.    WSC incorporates herein the allegations of Paragraph 1 through 95.

97.    The SimPort 1997 software is a protected trade secret of WSC.

98.    The simulation data loads for the Sherco, Armstrong and Arnot power plants also contain trade secrets of WSC.

99.    Although WSC paid KI to provide engineering labor for the development of the SimPort 1997 software, KI retained no proprietary interest in the software.

100.    Upon information and belief, KI has misappropriated the SimPort 1997 software and the data loads built with that technology by using the software and data loads in demonstrations to GSE without WSC's consent.

101.    KI's misappropriation was willful and malicious as it acted knowingly and intentionally, without legal justification or excuse.

102.    As a direct, proximate, and foreseeable result of KI's misappropriation, WSC has sustained, and continues to sustain, irreparable injury.

## COUNT V
## (Writ of Replevin Against KI)

103.    WSC incorporates herein the allegations of Paragraph 1 through 102.

104.    The simulation data loads for the Sherco, Armstrong and Arnot power plants were built by WSC, and provided to KI by WSC.

105.    WSC's right to the simulation data loads is superior to that of either KI or GSE.

106.    WSC has requested the return of the simulation data loads, but KI has refused to return them.

107.    Wherefore, WSC seeks a writ of replevin requiring KI to return all copies of the simulation data loads in its possession.

108.    WSC further seeks an order directing KI to demand the return of all copies of the simulation data loads it has provided to third-parties, and to return those copies to WSC as well.

### Count VI
### (Declaratory Judgment Action Against KI)

109.    WSC incorporates herein the allegations of Paragraph 1 through 108 of its Counterclaim.

110.    As set forth in the preceding paragraphs, WSC has incurred and continues to incur substantial financial losses in the form of lost contracts.  WSC  anticipates that it will incur additional losses if GSE's and KI's tortious conduct continues.

111.    An actual controversy has arisen between WSC and KI concerning the ownership of the "SimPort" name, and the ownership of the technology WSC is selling under the SimPort name.

112.    WSC desires a judicial determination of its rights with regard to SimPort and the SimPort software utilized by WSC.

**COUNT VII**
**(Trademark Infringement Pursuant to 15 U.S.C. § 1125(d) Against GSE)**

113.    WSC incorporates herein the allegations of Paragraph 1 through 112.

114.    WSC developed the SimPort technology and is the owner of the "SimPort" mark.  WSC's SimPort mark is distinctive.

115.    In February 2003, GSE registered two different domain names: "SIMPORT.US" and "SIMPORT.BIZ."

116.    GSE has no rights or legitimate interests in these domain names, and its registration was made in bad faith.

117.    The domain names are identical or confusingly similar to WSC's "SimPort" mark, and will create confusion in the marketplace.

118.    The internet sites accessed through "SIMPORT.US" and "SIMPORT.BIZ" are currently under construction, but any use of those sites to promote simulation software will cause confusion in the marketplace and irreparably harm WSC.


WHEREFORE, WSC prays that judgment be entered against GSE as follows:

1.    Adjudging GSE liable for compensatory and consequential damages in an amount to be proven at trial as a result of their tortious conduct;

2.    Transfer of the domain names "SIMPORT.US" and "SIMPORT.BIZ" to WSC;

3.    Awarding prejudgment and post-judgment interest; and

4.    Granting such other and further equitable relief and relief at law as the Court deems just and proper, including, but not limited to, payment of WSC's costs and attorneys' fees.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By:    _____/s/_____
       Bruce R. Genderson (Bar No. 02427)
       George A. Borden
       Margaret A. Keeley (Bar No. 15654)
       Ann Sagerson (Bar No. 15821)

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Counsel for Western Services Corporation and George Utmel*

Dated: October 30, 2003

## <u>JURY DEMAND</u>

Third party plaintiff WSC hereby demands a trial by jury for all issues so triable.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By:    _____/s/_____
        Bruce R. Genderson (Bar No. 02427)
        George A. Borden
        Margaret A. Keeley (Bar No. 15654)
        Ann Sagerson (Bar No. 15821)

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Counsel for Western Services Corporation and George Utmel*

Dated: October 30, 2003